ST. LOUIS & NORTH ARKANSAS RAILROAD COMPANY *v.* MATHIS.

Opinion delivered June 24, 1905.

1. MASTER AND SERVANT—CONTRIBUTORY NEGLIGENCE.—Evidence that a section hand was killed while endeavoring, under command of the section foreman, to remove a handcar from the track in front of an approaching train did not call for a direction to the jury to return a verdict for the defendant on the ground of plaintiff's contributory negligence. *St. Louis, Iron Mountain & Southern Railway Co.* v. *Rickman,* 65 Ark. 138, followed. (Page 188.)

2. CONSTITUTIONAL LAW—RESTRICTION OF APPELLATE POWERS.—A statute which limits the power of the circuit court to set aside a verdict for excessiveness of damages is a restriction upon the appellate powers of the Supreme Court, which reverses law cases only for errors of the trial court. (Page 190.)

3. SAME—POWER OF LEGISLATURE.—The appellate jurisdiction of Supreme Court, conferred by the Constitution, cannot be enlarged or divested by the Legislature. (Page 191.)

4. SAME—REGULATION OF APPELLATE POWERS.—Const. 1874, art. 7, § 4, conferring appellate jurisdiction on the Supreme Court, "under such restrictions as may from time to time be prescribed by law," does not confer upon the Legislature the power to limit the right of appeal, but only the power to prescribe regulations as to the manner of taking appeals and the time within which the same may be taken and prosecuted. (Page 191.)

5. SAME—INVALIDITY OF STATUTE RESTRICTING APPELLATE POWERS.—Kirby's Digest, § 6217, providing that "the verdict of any jury for the recovery of damages, where the measure thereof is indeterminate or uncertain, shall not be held to be excessive, or be set aside as excessive, except for some erroneous instruction, or upon evidence, aside from the amount of the damages assessed, that it was rendered under the influence of passion or prejudice," and further requiring the losing party to enter a release of errors as a condition of a remittitur of excessive damages, is an unconstitutional limitation on the appellate powers of the Supreme Court. (Page 192.)

6. EXCESSIVE DAMAGES—LIMIT.—While the damages to infant children by loss of the care, attention and moral training of their father are measurable by no fixed rules, but are left to the sound discretion of the jury, yet there is a limit to the amount to be allowed, and it is the duty of the appellate court to see that such limit is not exceeded. (Page 192.)

7. SAME—HOW ASCERTAINED.—While no amount of money can fully compensate children for the distress of mind suffered by them in the violent and painful death of their father, and in the loss of his af-

fectionate care and attention, it is the duty of the court, in determining whether the amount awarded was excessive, to ascertain what amount would constitute fair compensation for the injury. (Page 193.)

Appeal from Carroll Circuit Court.

JOHN N. TILLMAN, Judge.

Affirmed on remittitur.

*G. J. Crump,* for appellant.

Deceased was guilty of contributory negligence. 71 Ark. 590; 66 Ark. 238; 62 Ark. 156; *Ib.* 164; *Id.* 239; 57 Ark. 461; 69 Ark. 380; 48 Ark. 106; 56 Ark. 457; 54 Ark. 431, *et seq.* The verdict was excessive. As to right of deceased to rely upon instructions of foreman, see 65 Ark. 140.

*Festus O. Butt* and *Charles D. James,* for appellee.

The instructions were correct, and the evidence sustains the verdict. The sixth instruction correctly stated the law of contributory negligence, and the deceased, under the rule therein laid down, was not guilty thereof. 16 S. W. 397; 24 L. R. A. 719; 17 L. R. A. 291; 14 Am. & Eng. Enc. Law, 857; 65 Ark. 139. The verdict was not excessive. 58 Ark. 473; Kirby's Dig. § 6290; 60 Ark. 559.

McCULLOCH, J. This is a suit brought against appellant railroad company by the administrator of the estate of John Gunn, deceased, for the benefit of the widow and the next of kin of said decedent for damages occasioned by reason of the alleged negligent killing of deceased by a train of appellant. Damages are laid in the sum of $25,000, and plaintiff recovered a judgment for $10,000, from which the defendant appealed.

Appellant claims that the evidence is insufficient to sustain the verdict, and that the court erred in refusing to instruct the jury peremptorily to return a verdict in its favor, but concedes that, if the testimony is legally sufficient, there was no error in the instructions or other proceedings. Deceased was a section hand employed by appellant, and worked under one Lisk as foreman. On the morning of September 12, 1901, deceased and the foreman, and gang, of which he was a member, started on a handcar from Coin, a station on appellant's road, to the place of their labor of the day. After running only about one-fourth of a mile they discovered the approach of a local freight train,

and hastily stopped the handcar, and endeavored to remove it from the track. It is contended on behalf of appellee that Gunn was killed while assisting, under orders of the foreman, in the removal of the handcar from the track, and while so engaged appellant was guilty of negligence, through its foreman, in failing to warn him of the imminent danger. Appellant claims, on the other hand, that Gunn was duly warned of the near approach of the train, and, pursuant to the warning, left the track, but voluntarily returned to secure his dinner pail, and in so doing was struck by the engine and killed. On this point there is a sharp conflict in the testimony, and it is ·not the province of this court to determine where the weight lies. The foreman and several of the section hands testified that, when they discovered the approaching train, they, with deceased, stopped the handcar, and tried to lift it off the track, and partially succeeded, but one end of the car was against a stump, and they failed to get it off; that the foreman then called out to the hands to leave the car, and they all ran up the hill, and across a ditch about twelve feet away from the track, when deceased returned to the car to get his dinner pail, and was struck by the train. George Carson, a witness introduced by the plaintiff, testified that he was about 200 yards away, and saw the accident, which he described as follows: "There was one man standing at the left corner of the car, and when they went to throw the car off they throwed the car this way—one side—and there were three at that end, and two at this, and when it caught that way, the car dropped down, the hind end, and they seemed to give away, and let it drop two or three times before they got it off. About the time I thought they had shoved the car off the track, two of these men run right around the car there this way, and this man left at this corner had never raised up out of a stooping position, and these two men, just as they passed by, the engine struck the car, they just got away."

"Q. Before the car was struck, had any of these men left the track and gone back?

"A. No, sir; I never saw any come back; no man at all."

George Gunn, a son of deceased, testified that the accident occurred in his view, and he described it as follows:

"Well, like this way: the track (indicating) and the car running up that way, and they were all on there running. He was right there on the front end, and when they got ready to get off the car, why, three of them got off at one end, and two at the other end, and they moved the car around, and got it across the track that way, and then went to lifting the car and got it, it looked to me like, pretty near off, and part of the men started to run up the bank, and two of them stayed with that end of the car, and it looked to me like, I know it got one of them, and it looked like the other one just got away.

"Q. Which way were you looking?

"A. I was looking right up the track.

"Q. Was there anything in the track to obstruct your view?

"A. No, sir; he was struck at this corner of the car (indicating).

"Q. And the other man ran around the car, and ran up the bank?

"A. Yes, sir.

"Q. Had any of these men prior to that time left the handcar before that?

"A. They left when the train was pretty close.

"Q. They left just about the time the train struck the man?

"A. Yes, sir.

"Q. Did you see anybody before the train struck the car and the man; did you see any one run up the bank and come back?

"A. No, sir; no, sir."

Two of the witnesses, John Bridgeford, and T. L. Plummer, who were passengers on the train, testified that they looked out of the car window, and saw the engine strike the handcar and a man who appeared to be trying to get it off the track, and that several of the men were running up the hill. The testimony of both these witnesses tended to show that deceased did not leave the handcar and return after crossing the ditch. The jury was therefore warranted in finding from the testimony that deceased was struck while at work, under order of the foreman, removing the car, and that he did not leave the track and then return in the face of danger. Treating it as thus established that the deceased did not leave the handcar or track and return after receiv-

ing warning of the danger, there is no testimony tending to show contributory negligence on his part. Joining his fellow workmen at the accustomed meeting place that morning, he and they proceded, by direction and command of the foreman, toward the place at which they were to work. If the train was thus expected, and due care was not observed in awaiting its passage, it was the negligence of the foreman, who was vice-principal, and not the negligence of the section hands. They met the train in a curve, and there is evidence that no signal was given from the approaching train by whistle or bell. When the party discovered the approach of the train, they hastily descended from the handcar, and endeavored to remove it before the train reached them.

The language of the court in *St. Louis, I. M. & S. Ry. Co.* v. *Rickman,* 65 Ark. 138, is particularly applicable to the facts here: "What the plaintiff did was manifestly done in obedience to the orders of the foreman to get the car off quick. Plaintiff had a right to presume that the foreman, who was in a position to devote his whole attention to the approaching train and the efforts of his men to get the handcar off the track, could better determine than he what was best to be done under the circumstances. We do not think that the danger was so apparently imminent but that he could reasonably rely upon the direction of the foreman. He did so, and was injured. He should not be charged with contributory negligence under the circumstances."

We think there was sufficient evidence to sustain a verdict for the plaintiff, and the court did not err in refusing to take the case from the jury.

It is set forth as a further ground for new trial that the verdict is excessive. The testimony fairly establishes the fact that deceased contributed to the support of his family as much as $350 per annum, in addition to his earnings in supervision of his farm, and that the present value of an annuity in that sum for his expectancy would be $4,690. He owned a small farm of eighty acres of land, and was out of debt. It is also shown by undisputed testimony that he was a very industrious man of good moral character, and was especially solicitous as to the mental and moral training of his children. That he was a kind and indulgent father, provided well for his family, and gave much attention to

the proper instruction and education of his children. He had five children, the youngest being only two years of age at the time of the accident. This is a well-recognized element of damages in suits of this kind for the benefit of minor children, and it is held to be for the jury to say, from all the facts and circumstances found, what will be a fair compensation to the children for the pecuniary loss of the care and attention of the father in the way of training and instruction. *Railway Co.* v. *Sweet,* 60 Ark. 559; *Railway Co.* v. *Maddry,* 57 Ark. 306.

The amount of damages of this kind being of an indeterminate character, and left largely to the sound discretion of the jury, we cannot say as a matter of law that the verdict is so excessive as to appear to have been given by the jury under passion or prejudice.

The judgment is therefore affirmed.

### ON REHEARING.

Opinion delivered January 6, 1906.

*J. M. Moore* and *W. B. Smith* for appellant, on petition for rehearing.

1. The act of April 25, 1901, is unconstitutional (1) because it limits the circuit judges in the exercise of their rights to control and regulate procedings in their courts so as to do justice between litigants, by restricting the exercise of the discretion to two events; (2) because it prohibits the circuit judge from entering remittitur except upon the losing party waiving his constitutional right of appeal.

2. If the act was intended to apply to the Supreme Court, it is unconstitutional, being an encroachment on the functions of the judiciary. Art. 4, § § 1 and 2,Const.; 49 Ark. 160; 44 Ark. 273; 16 Ark. 384; 24 Ark. 91; 5 Ark. 710; 6 Ark. 71; 14 Ark. 568; 39 Ark. 82. The Legislature can only prescribe the mode and manner that shall be pursued in bringing cases before the Supreme Court. 25 Ark. 489; art. 7, sec. 4, Const.; 5 Ark. 362, 365.

3. If intended to be limited to circuit courts only, it is unconstitutional for reasons *supra,* and because it is a denial of the complete justice intended by sec. 13, art. 2, Const. See also 10 Lea (Tenn.), 366; 49 Ark. 495.

4.  The verdict was excessive.   57 Ark. 384; *Ib.* 306.

*Festus O. Butt* and *Chas. D. James,* for appellee.

McCulloch, J.   Counsel for appellant ask a reconsideration by the court of the question of excessiveness of the verdict, and in doing so they necessarily attack the validity of the act of April 25, 1901 (Kirby's Digest, § 6217), which is as follows:

"An act to regulate the practice in the circuit courts in certain cases."

"Be it enacted by the General Assembly of the State of Arkansas:

"Section 1.  The verdict of any jury rendered in any action for the recovery of damages, where the measure thereof is indeterminate or uncertain, shall not be held to be excessive, or be set aside as excessive, except for some erroneous instruction, or upon evidence, aside from the amount of the damages assessed, that it was rendered under the influence of passion or prejudice; provided, that the circuit judge presiding at the trial may, on motion for a new trial filed by the losing party, if he deems the verdict excessive, indicate the amount of such excess, and thereupon, if the losing party shall offer to file and enter of record a release of all errors that may have accrued at the trial if the prevailing party will remit the amount so deemed excessive, and the prevailing party shall refuse to remit the same, the verdict shall be set aside."

It is contended by learned counsel, first, that the statute applies only to practice in the circuit court, and not to this court on appeal; and, next, that, if it does apply to this court, it is void because it is an unauthorized curtailment by the legislative branch of government of the appellate jurisdiction vested by the Constitution in the court.

It seems plain to us that, if the statute is binding upon the circuit court, unless it be held to be unwarranted restriction upon the appellate jurisdiction of this court, it is also binding here on appeal, for the reason that this court only searches for errors in the proceeding below, and will reverse cases only on account of errors, either of omission or commission, of the trial court.

Our inquiry, then, is whether the statute in question is valid so far as it attempts to control this court in the determination

of cases on appeal. If it is, the effect of it is to prevent a review by this court of an erroneous assessment of damages made by a jury, and the failure of the trial court to correct the error. The right of appeal is, to that extent, cut off by the statute, if it be given full force. The statute also imposes upon an unsuccessful litigant, before he can accept a reduction of an excessive verdict, the penalty of surrendering his right of appeal.

The Constitution of the State confers upon this court, in the broadest terms, appellate jurisdiction co-extensive with the State. It provides that the Supreme Court shall have a general superintending control over all inferior courts of law and equity.

The section fixing jurisdiction of the court is as follows:

"The Supreme Court, except in case otherwise provided by this Constitution, shall have appellate jurisdiction only, which shall be co-extensive with the State, under such restrictions as may from time to time be prescribed by law. It shall have a general superintending control over all inferior courts of law and equity; and, in aid of its appellate and supervisory jurisdiction, it shall have power to issue writs of error and supersedeas, certiorari, habeas corpus, prohibition, mandamus and quo warranto, and other remedial writs, and to hear and determine the same, Its judges shall be conservators of the peace throughout the State, and shall severally have power to issue any of the aforesaid writs." Const. 1874, art. 7, § 4.

It has been often held by this court that the appellate jurisdiction conferred by the Constitution upon the court cannot be enlarged or divested by the Legislature. *State* v. *Ashley,* 1 Ark. 279; Ex parte *Woods,* 3 Ark. 532; Ex parte *Anthony,* 5 Ark. 358; *State* v. *Jones,* 22 Ark. 331; Ex parte *Batesville & Brinkley R. Co.,* 39 Ark. 82; *Simpson* v. *Simpson,* 25 Ark. 487; *O'Bannon* v. *Ragan,* 30 Ark. 181.

It follows, then, that, unless the Constitution empowers the Legislature to limit the appellate jurisdiction of the court, it cannot be done. It is contended on behalf of appellee that it was meant, by the use in the Constitution of the words "under such restrictions as may from time to time be prescribed by law," to confer upon the law-making body the power to limit the right of appeal. Placing this construction upon the language used, the

effect of the constitutional provision would be to give to the court only such appellate jurisdiction as the law-making body should see fit to leave to it. Bearing in mind our scheme of constitutional government, both State and National, and the policy of dividing it into three co-ordinate branches of equal dignity and power within defined limits, we cannot believe that the framers of the present Constitution meant to thus subordinate the jurisdiction of the highest court of the State to the will of the Legislature. For, if it be held that the Legislature may limit the power of the court to review the decision of an inferior court in one respect, it may do so in another; and if it may prohibit the court from reviewing one question in a case, it may prohibit the review of all questions, and may cut off the right of appeal altogether. Thus by the process of elimination the Legislature could strip the court of all appellate jurisdiction, and deny to litigants the right of appeal, which is guarantied by the Constitution. The manifest intention of the framers of the Constitution was, primarily, to give a right of appeal to the Supreme Court from all final judgments of circuit and chancery courts, but to vest in the Legislature the power to prescribe regulations as to manner of taking appeals and time within which the same may be taken and prosecuted. This is, we think, what is meant by the words "under such restrictions as may from time to time be prescribed by law." To construe it otherwise would be to make it read that the Supreme Court shall have only such appellate jurisdiction as may from time to time be prescribed by law. If the framers of the Constitution had intended to so limit the jurisdiction of the court, doubtless they would have employed a more appropriate and less ambiguous form of expression to convey that meaning. We therefore hold that it was beyond the power of the Legislature to prohibit an inquiry in this court as to the sufficiency of the evidence to sustain the amount of damages assessed by a jury, or require a litigant to surrender his right of appeal as a condition upon which he may accept the reduction by the trial court of an excessive verdict.

After careful reconsideration of the evidence in the case, we are constrained to believe that the verdict is for an excessive amount of damages. We said in the former opinion that the evi-

dence warranted a verdict for $4,690 damages to cover the prob-
able contributions of the deceased to the support of his family.
This is certainly the utmost limit to which the jury could have
gone upon this element of damages.  If we indulge in the pre-
sumption that the jury confined the verdict to the limits warranted
by the evidence as to this element, it leaves the sum of $5,310
which must have been assessed to cover damages for loss of the
care, attention and moral training of the father to his children.  It
is difficult to determine what amount should be allowed upon this
element of damages.  It is indeterminate, and is ascertained by no
fixed rules for admeasurement, and is left to the sound discretion
of the jury.  Yet there must be some limit to the amount to be
allowed, and it is the plain duty of the appellate court to see that
the just limits are not exceeded.  It is often said that where loss
of limb is sustained and great suffering endured, no amount of
money will compensate therefor; that no amount of money might
induce a person to voluntarily undergo the loss of limb and conse-
quent suffering; yet that would be a highly improper basis upon
which the damages should be estimated.  It is the duty of courts
and juries to allow such a sum as will fairly compensate for the
pecuniary loss.  So, in a case of this kind no amount of money
can fully compensate children for the distress of mind suffered by
them in the violent and painful death of the father, and in the loss
of his affectionate care and attention, but the court must ascertain .
some just amount to allow a fair compensation for the injury.
*Railway Co.* v. *Robbins,* 57 Ark. 384; *Railway Co.* v. *Maddry,* 57
Ark. 306; *Railway Co.* v. *Sweet,* 60 Ark. 550.

Believing, as we do, that the amount allowed by the jury,
either upon one or the other of the two elements of damages,
was excessive, it becomes our duty to remand this case for a new
trial, or to require the plaintiff to remit the judgment down to
such an amount as we can say the evidence fully warranted, there
being no errors of law in the proceedings.

We think that upon the whole proof, considering the earning
capacity of the deceased and the amount of contribution he would
probably have made to his family, together with the proof upon
the other element of damages, $8,000 will compensate for the loss
as fully as pecuniary compensation can be rendered.  So, if the

plaintiff will within fifteen days after this day, remit $2,000 of the judgment, the same will be affirmed as to the remainder; otherwise it will be reversed, and the cause remanded for a new trial.

It is so ordered.

HILL, C. J., (dissenting.)   When this case was decided last term, I participated in the decision, and was in full accord with the opinion affirming the case.

On motion for re-hearing the question of the damages, and the effect of the act of April 25, 1901, attempting to preclude inquiry into the amount of damages under certain circumstances, were resubmitted to counsel, with other similar cases, for further argument.   My health has enforced my absence from the court, and I have not participated in any of the proceedings on the motion for rehearing, and am writing this dissenting opinion in Arizona, and am dependent upon memory alone for the facts in the record.

My impressions of the act of April 25, 1901, were that it was a valid exercise of the legislative power, and did not impair the constitutional jurisdiction of the court, but merely regulated the practice in appeals in a certain class of cases.   But I have not seen the briefs of counsel, nor heard the argument on this subject, and am not prepared to discuss the constitutionality of that act, and such is not the purpose of this dissent.   It is a mooted question whether dissenting opinions are proper, but I think the better thought on the subject is that they serve an useful purpose.   If the majority opinion is fundamentally sound, the minority opinion will demonstrate it by lacking the basic elements itself, and the truth is thereby justified by the weak attack upon it.   If the majority opinion is not fundamentally sound, and the minority is, those who come after have the better reason pointed out, and can, and should overturn the erroneous decision.   It is in the hope that the reasons that I give will commend themselves to those who sit in judgment after we pass from authority, so that this case will not become fixed in our jurisprudence as a precedent, that this dissent is written.

The judgment reversed was for the sum of $10,000. The evidence of the earnings of the deceased, reduced under the ordin-

ary and usual rules of computation, sustains a verdict for a few hundred dollars less than $5,000. I do not recall the exact figures, but approximately $5,000. The only other item to sustain the other $5,000 of the verdict was the loss to the children of a father's care and instruction. The law on this subject was correctly presented to the jury, and the only question is whether $5,000 on this account is excessive. The evidence showed that the deceased was quite a poor man, with a large family of children, most of whom were minors, and several of tender years. He was a hard-working, sober, upright, Christian man. He took active part in church work, and required his children to attend Sabbath school, and was devoted to them, and was spending his life laboring for them and trying to raise them properly. While recognizing that money cannot compensate for such a loss, yet the law authorizes juries to assess a sum supposed to be an equivalent, as near as money could make it, of the loss of parental care and instruction. It is, at best, an elusive and uncertain element, to be requited in coin of the realm; but when the courts take from juries the determination of such questions, which from their very nature can best be determined by twelve men from the body of the county of "reasonable information and fair intelligence", then the confusion becomes confounded. All the courts should do with verdicts in such cases is to let them alone unless they are so grossly disproportionate to the subject-matter as to evidence having been produced by passion and prejudice. Then they should promptly be set aside, and a new trial granted, and not pared down. I am aware of the fact that there are several decisions of this court which are direct precedents for the order herein. The leading case on the subject was delivered, if I recall it correctly, between 15 and 20 years ago, and the limit in dollars and cents was pretty plainly indicated. Other cases have followed it, but it cannot be said that there has ever been any settled amount or maximum for this element of damage. Each case has stood on its own facts, and has not sought to go beyond them.

There are two reasons why I do not think these cases should control this one. (1). They settle no principle of law, and are merely the opinions on the amounts in the given cases before the court, and should not be of much weight in another case where

the facts are necessarily different. The opinion of judges on such propositions should not be considered as settling principles like decisions affecting title to real estate or rules of commercial paper. These amounts held excessive or not excessive in individual cases are but applications of principles, and not principles themselves, and hence should not carry the weight of *stare decisis,* and were not intended by their authors as carrying weight beyond the peculiar facts of the case then before the court.

(2.) Even if these decisions are regarded as precedents, yet the change in the earning power of money in the last 20 years must be considered. Twenty years ago ten per cent. was the prevailing rate in Arkansas, and usury was exacted all over the State, notwithstanding the heavy penalty against it. Today six per cent. is considered a splendid investment for large sums. The object in awarding damages for the death of a husband or father is to attempt to pecuniarily compensate for the revenue lost by reason of his death, and for his children this additional sum to compensate for parental care and instruction. Therefore in calculating the amount the revenue-producing quality is the point of view, and a decision holding $1,000 to be reasonable 20 years ago should be authority today for $2,000.

For these reasons prior decisions of the court on this question do not seem to me should be controlling. But, beyond all question of precedent, I put the correct view upon the broader proposition that the jury did right in allowing at least $5,000 to these minor children for loss of parental care. The evidence shows the father was giving, and doubtless would have continued to give, them instructions which would lead them to be Christian men and women and members of one of the great religious denominations, and was sending them to school, and was educating them as his means permitted. Of course, no sum can compensate such loss, and it will not do to say, because no sum will compensate it, that no verdict is excessive. There must be reason and moderation in all things, and only a sum sustained which may appear to the court to be rendered responsive to evidence justifying the sum awarded. The character of the man, what he was doing for his children as earnest of what he would do for them, are the principal matters to consider in approximating a

sum to represent this intangible, yet substantial, element of damage. Under the evidence in this case, I think the amount awarded by the jury was moderate; certainly not so grossly disproportionate to the subject-matter as to induce the belief that passion and prejudice, and not an honest endeavor to fairly approximate the money value of such loss, swayed them.

Unless the verdict appears to be improperly produced, I take it to be the duty of the court to let it alone. It is the essence of our law, and has been for many centuries, to leave such matters in the sound discretion of the jury, and to cut down this amount from $5,000 to $3,000 on this account is to substitute the judgment of the judges of this court for that of the jury, and against this order I dissent.