JULIUS F. KRUG, Respondent *v.* JOHN PITASS et al., Appellants.

1. LIBEL — ARTICLE REFLECTING ON PHYSICIAN LIBELOUS PER SE. An article in a Polish newspaper, concerning a physician and druggist largely patronized by Poles among whom the paper circulates, is libelous upon its face, where it refers to his profession and business, calls him a blockhead or fool, and appeals to the Poles not to trust themselves or their families to his professional care when he so hated them that he would not help them if he could.

2. PUNITIVE DAMAGES — WHEN NOT RECOVERABLE. Punitive damages cannot be recovered in an action for libel for general malice, but only for such particular malice as existed when the libel was published and which had some influence in causing its publication.

3. MALICE OF ONE, WHEN NOT IMPUTABLE TO OTHER DEFENDANTS. In an action for libel against several defendants, the malice of one defendant cannot be imputed to the others without connecting proof.

4. RECOVERY OF PUNITIVE DAMAGES AGAINST ALL FOR THE GENERAL MALICE OF ONE OF THE DEFENDANTS. Where, in an action against several defendants for libel, to recover damages for the publication of an article libelous *per se*, each of the defendants testifies that he had no malice or ill-will toward the plaintiff, and the latter, in order to show express malice, justifying a recovery of punitive damages, is permitted to prove as against all, that several years before the publication, one of them, who knew nothing about the article until after it had been published, had made statements expressing contempt and ill-will for the plaintiff, never heard by or communicated to the other defendants before the publication, a judgment recovered against all must be reversed, as the general malice proved neither caused nor prompted the publication of the libel, and has, as it must be presumed, entered into the verdict against all in violation of the rights of each.

*Krug* v. *Pitass*, 16 App. Div. 480, reversed.

(Submitted January 29, 1900; decided February 27, 1900.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the fourth judicial department, entered April 17, 1897, affirming a judgment in favor of plaintiff entered upon a verdict, and an order denying a motion for a new trial.

This is an action to recover damages alleged to have been caused by the publication of an article concerning the plaintiff in a newspaper published in the Polish language at the city of Buffalo, known as "Polak W. Ameryce," or the Pole in America. The defendant Pitass was the proprietor of said newspaper, the defendant Slisz the editor, and the article in question was a communication signed by the other defendant, Smeja.

The plaintiff, a practicing physician, kept a drug store in the Polish section of Buffalo, and was largely patronized by the people of that nationality, among whom said newspaper was widely circulated. On the 23rd of February, 1894, the communication in question was published in the Polish language, and, as translated by a witness for the plaintiff upon the trial, was as follows:

"BUFFALO, NEW YORK.

"RESPECTABLE SIRS:

"Excuse me for the trouble I do you, but I must complain of a certain Dutchman doctor who lives from the Poles, dwells among them, and that which he is and which he has, he has the Poles to thank for. However, at every opportunity, he scorns them and talks about them in a contemptible manner. I will now tell you of a certain incident of which I have been a witness. It was on the evening of the 3rd or 4th of Februruary, this year, that I met Dr. Krug at the corner of Broadway and Kuempel street. After the shake of hands I asked him about the health of one of the members of our society, asking him to tell me the truth, whether he really is sick. Dr. Krug got so mad about it that he began to holler as if the devils were skinning him, and abused the Poles for all the world stands. He hollered that the Poles are a damned cattle, a confounded nation, scoundrels, loafers, sows, and so on.

Seeing that the Dutchman was furious with madness, I called his attention that he be more careful in his words, for that can hurt him very much. Dr. Krug answered me, 'I don't care for the Poles. I can get along without them, and you can go to the devil.' This what I have said about I can corroborate under oath, and I wish to be responsible for it. Now, I recall myself to all the Polish societies and all the Poles of Buffalo that they consider whether we can allow to be so disrespected by such a first or second fool as Dr. Krug. Can we trust ourselves and our families under the care of such a man when Dr. Krug so hates the Poles that he could drown each one in a spoon of water? A universal contempt should meet this scoundrel who does not know that the Poles are just as good and maybe better citizens than Dr. Krug. Such people as the latter brings disgrace not only to their own nationality, but also all the American citizens. It would be a great time that the Poles of Buffalo be convinced what kind of an enemy to them Dr. Krug is.

" MARCEL SMEJA,

" 1060 Broadway,

" *President of the St. Joseph Society.*"

" The above correspondence Marcel Smeja signed in our presence and said he would be responsible for it.

" J. M. ROZAN.

" M. WOJCIESHOWSKI."

The translation given by a witness for the defendants was substantially the same except that it spoke of the plaintiff as a " German Doctor " instead of a " Dutchman Doctor," and toward the close of the article the version was as follows :

" Now I call myself to all the Polish Societies and to all the Poles in Buffalo, whether we should allow such a first better blockhead or fool, as Dr. Krug, whether to such a man we can entrust ourselves and our families to cure, when Dr. Krug so hates the Poles that he would drown them in a spoon of water. Universal contempt should meet such a good for nothing or fellow, who does not know that the Poles are as good or better citizens than Dr. Krug, for such a man as the

last brings disgrace not only to their own nationality, but the whole American Public. It will be time that Poles in Buffalo should learn how great an emeny of theirs is Dr. Krug."

"Drowning a man in a spoonful of water," as the witnesses on both sides testified, is a Polish expression meaning that the person spoken of " would do anything, but not heal," or that " he would not hurt or help a man if he could."

The defendants answered separately, admitting the publication, but denying the accuracy of the translation as alleged in the complaint. Each denied that he acted through malice and pleaded as a justification that the article was true.

Upon the trial it appeared that the plaintiff had given to a member of a benevolent society, of which the defendant Smeja was president, a certificate that he was ill so as to enable him to obtain " a sick benefit;" that on the 2nd of February, 1894, the plaintiff met Smeja, who inquired about the illness of this man and a controversy arose between them, during which, as it was claimed, the plaintiff abused the Polish people and this led to the preparation of the article by Smeja, who took it to Slisz, the editor, vouched for its accuracy and requested him to publish it. It was then published by direction of the editor, without the knowledge of the defendant, Pitass, who had nothing to do with the publication, except that he owned the newspaper.

Each of the defendants testified that he had no malice or ill-will toward the plaintiff. The defendant Pitass, on cross-examination, swore that he never had any ill-feeling toward the plaintiff, and never told any one that he was going to run him out of town.

The plaintiff was allowed to show, under objection and exception, in due form, that four or five years before the communication was published the defendant Pitass said the plaintiff " was no doctor, as far as he knew about him, and he thought he could cure cattle or pigs, or something of the kind, but not people, and that this place in Buffalo, here, is no place either for him or the man from Fillmore Avenue," and that he would not be very long in Buffalo. This evidence, although

offered in rebuttal, was received, according to the declaration of the trial judge, "as direct evidence on the question of malice."

The jury rendered a verdict in favor of the plaintiff for $6,250, and the judgment entered thereon having been affirmed in the Appellate Division, by a divided vote, the defendant appealed to this court.

*John W. Fisher* for appellants. The article proven was not libelous *per se* and no special damages being alleged or proven plaintiff was not entitled to recover. (*Sanderson* v. *Caldwell*, 45 N. Y. 400; *More* v. *Bennett*, 48 N. Y. 472; *Foot* v. *Brown*, 8 Johns. 64; *Camp* v. *Martin*, 23 Conn. 86; *Winchell* v. *Argus Co.*, 69 Hun, 359; Odgers on Slander & Libel, 64; Starkie on Slander & Libel, 110.) The court erred in directing the jury that the article attacked the reputation of the plaintiff as a doctor and was, therefore, libelous *per se.* (Starkie on Slander & Libel, 110; Odgers on Slander, 64; *Oakley* v. *Farrington*, 1 Johns. Cas. 130; *Van Tassel* v. *Capron*, 1 Den. 250; *Sanderson* v. *Caldwell*, 45 N. Y. 398.) The court erred in admitting under objection and exception proof of ill-will previously felt by certain of the defendants and not by others. (Starkie on Slander & Libel, 465; *Clark* v. *Newsam*, 1 Exch. 131; *Hearne* v. *De Young*, 119 Cal. 670; *Dyett* v. *Hyman*, 129 N. Y. 351; *Robertson* v. *Wylde*, 2 M. & R. 2; *Eviston* v. *Cramer*, 57 Wis. 570; *Bradley* v. *Cramer*, 66 Wis. 297; *Haines* v. *Schultz*, 50 N. J. L. 481; *McCarthy* v. *Der Armitt*, 99 Penn. St. 83; *Huddleston* v. *West Bellevue*, 111 Penn. St. 123.)

*Leroy Andrus* for respondent. The article is in itself of so injurious a character that the law presumes a general loss or damage as a consequence of its publication, and no proof thereof was required, but the plaintiff still had the right to give such proof under the allegations of the complaint. (*Edsall* v. *Brooks*, 2 Robt. 29; *Moore* v. *M. Nat. Bank*, 123 N. Y. 420; *Gibson* v. *Williams*, 4 Wend. 320; *Hartman* v. *M. J. Assn.*, 46 N. Y. S. R. 183; *Sanderson* v. *Caldwell*, 45 N. Y.

398; *Moore* v. *Francis*, 121 N. Y. 199; *Gates* v. *N. Y. R. Co.*, 155 N. Y. 237; *Gideon* v. *Dwyer*, 87 Hun, 249; *Stokes* v. *Stokes*, 76 Hun, 314; *Chiatovich* v. *Hanchett*, 88 Fed. Rep. 877.) Where in an action for libel brought against several defendants each testifies that he always entertained friendly feelings towards the plaintiff, or that he never entertained ill-feelings towards him, evidence is competent for the purpose of contradiction by showing that some or all of them expressed unfriendly sentiments at some time prior to the publication. (*S. Nat. Bank* v. *Dix*, 23 N. Y. Wkly. Dig. 367; *Beuerlien* v. *O'Leary*, 149 N. Y. 33; *Wright* v. *Nostrand*, 94 N. Y. 41; *Starr* v. *Cragin*, 24 Hun, 177; *Hotchkiss* v. *G. F. Ins. Co.*, 5 Hun, 90; *Barrett* v. *Long*, 3 H. L. Cas. 414; *Harmon* v. *Harmon*, 61 Me. 233; *Pearson* v. *Lemaitre*, 5 M. & G. 700; *McDermott* v. *E. Journal*, 43 N. J. L. 494; *Schultz* v. *T. A. R. R. Co.*, 89 N. Y. 242.)

VANN, J. The article in question, according to either translation, was libelous upon its face, because it charged the plaintiff with a want of professional ability and integrity and thus endangered the gain derived from his vocation. (*Cruikshank* v. *Gordon*, 118 N. Y. 178; *Mattice* v. *Wilcox*, 147 N. Y. 624; Flood on Libel & Slander, 114.) Referring to him as a physician, it called him a blockhead or fool, and appealed to all the Poles in Buffalo not to intrust themselves or their families to his professional care, when he so hated them that he would not help them if he could. The words used had a direct relation to his business and assailed him in his capacity as a physician. They touched his profession, because they held him out as unworthy of employment and appealed to his old patients to no longer employ him. Calling a physician, as such, a blockhead or fool necessarily reflects upon his ability to practice medicine, and speaking of him as so influenced by hatred toward his patients that he would not heal them, necessarily reflects upon his integrity as a physician. "To impute duncehood or want of scholarship to a member of either of the learned professions touches his profession."

(Cooke's Law of Defamation, 18; *Peard* v. *Jones*, Cro. Car. 382.) The reflection was not simply upon the character of the plaintiff as a man, but upon his character as a physician, for it imputed a want of those qualifications which attract patronage and are essential to the calling. It tended to undermine him in the confidence of the community, which is the foundation of professional success. The article was actionable without proof of any damages, for the law imputes malice to the defendants and presumes that damages were sustained by the plaintiff from the bare act of publication. (*Sanderson* v. *Caldwell*, 45 N. Y. 398; *Van Tassel* v. *Capron*, 1 Den. 250; 13 Am. & Eng. Encyc. of Law, 312.)

While the plaintiff was thus entitled to recover on account of implied malice, his damages, without further proof, would be limited to such an amount as would fairly compensate him for the actual injury sustained. In order to recover punitive damages, also, it was necessary for him to furnish evidence of express malice, or malice in fact, as distinguished from malice implied. Implied malice, in an action for libel, consists in publishing, without justifiable cause, that which is injurious to the character of another. It is a presumption drawn by the law from the simple fact of publication. Express malice consists in such a publication from ill-will, or some wrongful motive, implying a willingness or intent to injure, in addition to the intent to do the unlawful act. It requires affirmative proof beyond the act of publishing, indicating ill-feeling or such want of feeling as to impute a bad motive. It does not become an issue, when the article is libelous on its face, unless punitive damages are claimed.

In order to establish express malice, the plaintiff was allowed to show, as against all the defendants, that, several years prior to the publication, the defendant Pitass had made remarks about him, expressing contempt and ill-will. There was no connection between these remarks and the other defendants, who neither heard them nor ever heard of them, so far as appears. It is undisputed that Pitass knew nothing about the article until some time after it had been published. He did

not directly or indirectly cause or consent to its publication. He was liable only because he owned the newspaper, and was responsible for the acts of his agents in publishing it. His previous statements did not cause the publication, nor have any effect upon it. Between those statements and the fact of publication there was no connection and no relation of cause and effect. They did not enter into, or become part of, or have any bearing upon, the wrong of which the plaintiff complains. As the article would have been published if they had not been made, they were immaterial, for they did not touch the wrongful act, and could not aggravate the damages. Punitive damages, which are in excess of the actual loss, are allowed where the wrong is aggravated by evil motives in order to punish the wrongdoer for his misconduct and furnish a wholesome example. As was said by the Supreme Court of the United States in an important case, " whenever the injury complained of has been inflicted maliciously or wantonly, and with circumstances of contumely or indignity, the jury are not limited to the ascertainment of a simple compensation for the wrong committed against the aggrieved person. But the malice spoken of in this rule is not merely the doing of an unlawful or injurious act. The word implies that the act complained of was conceived in the spirit of mischief, or of criminal indifference to civil obligations." (*Phila., Wilmington & Baltimore R. R. Co.* v. *Quigley,* 62 U. S. 202, 213.)

Did Pitass inflict the injury upon the plaintiff maliciously, when he knew nothing about it at the time it was done, and was only liable as owner of the newspaper? Did he, "in a spirit of mischief," conceive the act done by his agent without his knowledge? Could his malicious remarks, made in 1890, leap forward and, without knowledge or action on his part, become blended with the act of his agent in 1894? Did his agent, the editor, conceive the act "in a spirit of mischief," which never entered his own mind, but existed at a remote period in the mind of another? Did the writer of the article act under the influence of words neither spoken in his presence nor communicated to him in any way?

21

In an action for a tort there can be no recovery of punitive damages for general malice, but only for such particular malice as existed when the tortious act was done and which had some influence in causing it to be done. As was once said by this court, " malice must be proved, not mere general ill-will, but malice in the special case set forth in the pleadings, to be inferred from it and the attending circumstances." (*Howard* v. *Sexton*, 4 N. Y. 157, 161.) Moreover, the malice of one defendant cannot be imputed to another without connecting proof. "If two be sued, the motive of one must not be allowed to aggravate the damages against the other. Nor should the improper motive of an agent be matter of aggravation against his principal." (Bigelow's Odgers on Libel & Slander, 296 ; *Detroit Daily Post Co.* v. *McArthur*, 16 Mich. 447; *Craker* v. *C. & N. W. Ry. Co.*, 36 Wis. 658; *Haines* v. *Schultz*, 50 N. J. L. 481; *Clark* v. *Newsam*, 1 Ex. 131, 139 ; *Carmichael* v. *Waterford & Limerick Ry. Co.*, 13 Ir. L. R. 313 ; *Robertson* v. *Wylde*, 2 Moo. & Rob. 101.)

Neither the author nor editor was a party to the malice of the publisher, and his malice did no harm because it had no effect upon the result. While he was responsible for their acts, they were not responsible for his motives, of which they had no knowledge. He was not responsible for his motives in connection with their acts, because there was no connection. The malice proved in this case did not cause the conduct complained of. The one guilty of malice did not commit the wrong except through an agent, who knew nothing about the malicious feelings of his principal. The principal was not liable for general malice, but only for such particular malice as was connected with the publication. The agent was not liable for the general malice of his principal, of which he knew nothing, and which had no connection with the wrong done. The writer of the article was not liable for the malice of another, of which he had never heard, and which had no influence upon the wrongful act. Yet the general malice of one out of three defendants, although it had no connection with the wrong, has, as it must be presumed, entered into the

verdict of sixty-two hundred and fifty dollars against all, in violation of the rights of each.

As the malice proved neither caused nor prompted the publication of the libel, the judgment must be reversed and a new trial granted, with costs to abide the event.

PARKER, Ch. J., GRAY, BARTLETT, MARTIN, CULLEN and WERNER, JJ., concur.

Judgment reversed, etc.