This is a civil action brought by plaintiff against defendants for libel. The Times Publishing Company, being a corporation and publishing TheRaleigh Times, John A. Park, the publisher, and O. J. Coffin the editor. Plaintiff alleges that The Raleigh Times has a larger circulation in the city of Raleigh and surrounding territory, and has some circulation in Cabarrus County. He further alleges:
"2. That the plaintiff is a resident of Concord, Cabarrus County, N.C. and is now the pastor in charge of McGill Street Baptist Church, in the city of Concord; that the plaintiff, instead of being an `immigrant ignoramus,' as alleged by defendant in the libelous and defamatory article hereinafter complained of, is a native of North Carolina, having been born and reared in Rutherford County, N.C. and lived there till seventeen years of age, and was prepared for college at Mooresboro Academy in Rutherford County; that he is a graduate of Furman University at Greenville, S.C.; a graduate of Southern Baptist Theological Seminary at Louisville, Ky.; that he spent two years in post graduate study at Shurtleff College, at Upper Alton, Ill.; that he spent three years in post graduate study at the University of Chicago, at Chicago, Ill.; that he has the degree of Doctor of Philosophy; that his Alma Mater, Furman University, has conferred on him the honorary degree of Doctor of Divinity; that he has served as educator in the following: as Dean of Burlington Institute, at Burlington, Iowa; Dean of San Marcos Baptist Academy, at San Marcos, Texas; as President of Stephens College, Columbia, Mo. That in addition to his services as an educator he has filled the following pastorates, viz.: Pastor of First Baptist Church, Shelbino, Mo.; First Baptist Church, St. Joseph, Mo.; Pastor First Baptist Church, Gonzales, Texas, and now pastor of McGill Street Baptist Church of Concord, N.C.
"3. That the defendants, on 23 February, 1926, contrivingly and wickedly and maliciously intending to injure the plaintiff in his good name, fame, credit and character, both as an individual and as an educator and as a minister of the Gospel, and to bring him both as an individual and as an educator and as a minister of the Gospel into public ridicule, contempt, disgrace and scandal with and amongst his neighbors, members of his congregation, and members of all the churches of *Page 148 
the Baptist denomination in the city of Raleigh, and the State of North Carolina, and to cause it to be believed and suspected by the citizens of North Carolina, both in the city of Concord and in the city of Raleigh, and elsewhere, and especially by the members of the Baptist denomination in said city of Raleigh and elsewhere in the State of North Carolina that he, the said plaintiff, had been, and was guilty of being as defendants alleged, an `unmannerly' and `discourteous' person who had to be `suppressed,' and that he was `ignorant' and an `uncharitable' minister of the Gospel, and withal an `immigrant ignoramus,' with an implied insinuation that his character was `unproven,' said defendants to vex, harass, oppress and destroy plaintiff's personal and professional character and reputation, both as a scholar and as a Baptist minister, did falsely and maliciously compose, write and publish in a newspaper called TheRaleigh Times of and concerning him the said plaintiff, a false, contemptuous, scandalous and defamatory libel hereinafter set forth, viz.:
"`PENTUFF RE-ENTERS EVOLUTION FIGHT.
"`We see by the Sunday morning paper of this city that Fuquay Springs, under the leadership of one Pentuff, of Concord, has declared war against what it is pleased to call evolution.
"`We cannot say that Fuquay Springs does not know its stuff, but we do state without fear of successful contradiction that if it learned about evolution from Pentuff, it might just as well go back to the encyclopedia or some other authority for additional information.
"`For Pentuff, if our memory does not play us false, is the same chap who tried to tell the legislative committee on education all about evolution at the last session of the General Assembly. He was supposed to be shedding light on the Poole resolution and its probable results. Beyond stating categorically that he had been president of a college or two, of which nobody in the audience had ever heard, and that science had disapproved something that he called "evolution," but had evidently never met, he contributed anything to the discussion.
"`He was, indeed, so unmannerly in his approach to the matter before the House, so discourteous to those whom he deemed to be in disagreement with him, that the chairman of the committee, Representative Connor of Wilson, suppressed him.
"`At Fuquay Springs, with none to check his observations or to make him justify his conclusions, we have no doubt that he convinced the more vociferous members of his audience that he knew something about the subject on which he elected to converse.
"`There has not to our knowledge appeared in public within the memory of the present generation of North Carolina a more ignorant *Page 149 
man than Pentuff, or one less charitable towards men who might honestly disagree with him. If Fuquay Springs will insist on taking the word of an immigrant ignoramus against that of men of proven character and intelligence, such as Drs. Vann and Poteat, whom it has known all their lives, we suppose there is nothing that can be done about it.
"`But it does the intelligence of this Wake County community scant credit.'
"That the false, contemptuous, malicious, defamatory and libelous matter in above article which plaintiff herein alleges to be false, malicious and defamatory is in the following paragraphs, viz.:
"He was, indeed, so unmannerly in his approach to the matter before the House, so discourteous to those to whom he deemed to be in disagreement with him that the chairman of the committee, Representative Connor, of Wilson, suppressed him.
"At Fuquay Springs, with none to check his observations or to make him justify his conclusions, we have no doubt that he convinced the more vociferous members of his audience that he knew something about the subject on which he elected to converse.
"There has not, to our knowledge, appeared in public within the memory of the present generation of North Carolinians, a more ignorant man than Pentuff, or one less charitable towards men who might honestly disagree with him. If Fuquay Springs will insist on taking the word of an immigrant ignoramus against that of men of proven character and intelligence, such as Drs. Vann and Poteat, whom it has known all their lives, we suppose there is nothing that can be done about it.
"But it does the intelligence of the Wake County community scant credit."
"4. That by reason of said publication in said Raleigh Times, a newspaper having a large circulation in the city of Raleigh and surrounding counties, and also having a circulation in city of Concord, where plaintiff resides, and by means of committing of several wrongs and grievances by said defendant, the plaintiff has been, and still is, injured in his good name, fame, credit, character and reputation both as an individual and professionally as an educator and as a minister of the Gospel and brought into public ridicule, contempt, disgrace and disrepute with and amongst a large body of citizens to plaintiff unknown, the same being readers of saidRaleigh Times, and being persons who have read said libelous and defamatory article in said Raleigh Times as above set forth in the following manner, viz.:
"(a) By reason of the allegation that plaintiff was so `unmannerly' and `discourteous' before the legislative committee that plaintiff was `suppressed' by Chairman Connor, the character of plaintiff is injured *Page 150 
both as an individual and as an educator, and as a minister of the Gospel, by leading people to believe that plaintiff is in fact `unmannerly' and `discourteous.'
"(b) By reason of the allegation that, `There has not, to our knowledge, appeared in public within the memory of the present generation a moreignorant man than Pentuff, or one less charitable, and by reason of the further allegation that, "If Fuquay Springs will insist on taking the word of an `immigrant ignoramus' against that of men of `proven' character and intelligence such as Drs. Vann and Poteat, we suppose there is nothing that can be done about it,' the character and reputation of plaintiff as a teacher and educator and as a minister of the Gospel is greatly injured, damaged and destroyed in that said plaintiff as an educator and as a minister of the Gospel is largely dependent for his livelihood and living upon his being acceptable as an educator and as a minister of the Gospel, and said defendants have wrongfully, maliciously and by false statements created the belief and impression that plaintiff is `ignorant' and an `ignoramus,' and therefore not fit to be chosen either as an educator or as a minister of the Gospel, thereby depriving plaintiff of the possibility of securing employment either as teacher or minister outside the circles where he is already well and favorably known.
"(c) That by reason of said false and malicious and libelous and defamatory publication by defendant, plaintiff has suffered great mental anguish, both personally and in contemplation of the pain and suffering caused to plaintiff's wife on account of said publication by defendant.
"That by reason of the said publication and the said injury to his character and reputation as an educator and as an individual and a minister of the Gospel, and the said mental anguish and suffering as above set forth, the plaintiff has been and is still damaged in the sum of twenty-five thousand dollars.
"5. That plaintiff did five or more days before the commencement of action serve notice in writing on the defendants, specifying the articles and the statements therein which were false, libelous and defamatory, and the defendants have made no retraction or apology therefor." Demand for damages, $25,000.
The answer of defendants admits The Times Publishing Company is a corporation and publishes The Raleigh Times; John A. Park is the publisher, and O. J. Coffin the editor. And further:
"2. Answering allegation two of the complaint, these defendants admit that James R. Pentuff, the plaintiff, resides in Concord, North Carolina, and at the time of the filing of the complaint herein was pastor of McGill Street Baptist Church in said city; that the words `immigrant ignoramus' referred to in said allegation as used in the editorial appearing *Page 151 
in The Raleigh Times of which plaintiff complains were true, but these defendants expressly deny that they wrote or published any libelous and defamatory article, as alleged; and that as to all other allegations and things contained in said allegation, these defendants have no knowledge or information sufficient to form a belief thereon, and therefore deny the same.
"3. Answering allegation three of the complaint, these defendants expressly deny each and every allegation therein contained, except as to the publication of the editorial from The Raleigh Times therein recited, and as to the said editorial these defendants affirm the truth of all statements therein contained.
"4. Allegation four of the complaint is denied.
"5. Answering allegation five of the complaint, these defendants admit that five or more days before the commencement of this action a notice in writing was received through the mail by these defendants, and these defendants further admit that they have made no retraction or apology on account of the editorial complained of.
"Wherefore, having fully answered, these defendants pray that this action be dismissed," etc.
The other necessary facts will be set forth in the opinion.
At the close of plaintiff's evidence the defendants made a motion for judgment as in case of nonsuit, which motion was allowed by the court below. The plaintiff excepted, assigned error, and appealed to the Supreme Court.
On the trial plaintiff introduced evidence to sustain the allegations of the complaint. The defendants introduced no evidence, but on cross-examination of plaintiff brought out facts tending to impeach his credibility as a witness.
C. S., 2429, is as follows: "Before any action, either civil or criminal, is brought for the publication, in a newspaper or periodical, of a libel, the plaintiff or prosecutor shall at least five days before instituting such action serve notice in writing on the defendant, specifying the article and the statements therein which he alleges to be false and defamatory."
C. S., 2430: "If it appears upon the trial that said article was published in good faith, that its falsity was due to an honest mistake of the facts, and that there were reasonable grounds for believing that the statements in said article were true, and that within ten days after the service of said notice a full and fair correction, apology and retraction was published in the same editions or corresponding issues of the newspaper or periodical in which said article appeared, and in a conspicuous *Page 152 
place and type as was said original article, then the plaintiff in such case, if a civil action, shall recover only actual damages, and if, in criminal proceeding, a verdict of `guilty' is rendered on such a state of facts, the defendant shall be fined a penny and the costs, and no more."
C. S., 2431: "The two preceding sections shall not apply to anonymous communications and publications."
The above law was passed by the General Assembly of 1901, ch. 557, and is known as the "London Libel Law." It was held constitutional in Osborn v.Leach, 135 N.C. at p. 641. Douglas, J., concurring in result, said: "While concurring in the result, I feel constrained to say that in my opinion the so-called `Libel Act' is unconstitutional, inasmuch as it discriminates between the editor of a newspaper and the ordinary citizen. If I write a letter libeling an editor, that perhaps at most ten people may see, and he libels me by printing identical charges against me that tenthousand people may see, I am subject to pains and penalties from which he is exempted by operation of the statute. Whatever other merits the act may have, I do not think that such discrimination can be sustained under the explicit provision of our Constitution. It is, however, due to the Court to say that its opinion eliminates from the act its most dangerous features.Walker, J., concurs in result only. Connor J., did not sit on the hearing of this case."
The words "actual damages," in the "London Libel Law," include (1) pecuniary loss, direct or indirect; (2) damages for physical pain and inconvenience; (3) damages for mental suffering; (4) damages for injury to reputation; therefore, it does not abridge the responsibility for the abuse of the freedom of the press and is unconstitutional. The statute was held constitutional, as it forgave punitive damages in case of retraction.Osborn v. Leach, supra; Connor and Cheshire, Const. of N.C. Anno., p. 95.
Similar acts have been held constitutional and unconstitutional in other states. The decision in the Osborn case, supra, is the law of this jurisdiction.
Plaintiff offered in evidence the editorial contained in The RaleighTimes of 24 March, 1926, as follows:
"TO SUE OR NOT TO SUE, PENTUFF'S QUESTION
"One J. R. Pentuff of Concord, by profession a preacher and Ph.D., and by practice of recent months somewhat of an agitator presumably in the interest of the faith founded some two millenniums since by a certain Carpenter of Nazareth, has filed against the Times Publishing Company, John A. Park, president, and Oscar J. Coffin, editor, suit for $25,000, alleged libel contained in an editorial of The Raleigh Times of 23 February. *Page 153 
"First notice of Mr. Pentuff's intention was received on 4 March by Editor Coffin in a letter addressed to him and John A. Park, president of The Times Publishing Company. This letter we quote exactly as written, allowing for a little variation on the part of a linotype machine, which cannot do everything a typewriter will.
"Mr. Pentuff wrote:
"`To John A. Park, publisher, O. J. Coffin, editor, and Times Publishing Company, publishers of The Raleigh Times:
"`Take notice that the undersigned intends to bring a civil action against you for damages for the libel upon him by you by reason of your publication in the edition of 23 February, 1926, of The Raleigh Times, the following article: The editorial at top of second column headed "Pentuff Reenters Evolution Fight," the following statements in said article being false and defamatory:
"`There has not to our knowledge appeared in public within the memory of the present generation of North Carolinians a more ignorant man than Pentuff, or one less charitable toward men who might honestly disagree with him. If Fuquay Springs will insist on taking the word of an immigrant ignoramus against that of men of proven character and intelligence, such as Drs. Vann and Poteat, who it has been known all their lives, we suppose there is nothing that can be done about it.
"`He was, indeed, so unmannerly in his approach to the matter before the house, so discourteous to those whom he deemed to be in disagreement with him that the chairman of the committee, Representative Connor, of Wilson, suppressed him. (Signed) J. R. Pentuff. Concord, N.C. 3 March, 1926.'
"Publisher Park being out of the city, and the editor seeing nothing then as he does now to retract or apologize for, nothing was done about the matter. Perhaps The Times outfit had some doubt as to whether a lawyer could be found who would bring a suit on grounds so untenable.
"The author of the alleged libel, for a matter of some eight years editor of this paper, did not at the time of its writing or at the receipt of Mr. Pentuff's letter, and does not now consider his description of Mr. Pentuff as `an immigrant ignoramus,' or `unmannerly,' to be actionable. However, that is for the courts, at the demand of Mr. Pentuff, to determine.
"There is nothing to add to what has been said; that is no desire or intention on the part of The Times to subtract anything. In our opinion, J. R. Pentuff is ignorant, he is unmannerly in debate, and he is uncharitable in his dealings with good and intelligent men of even his own denomination.
"If that be `false and defamatory,' let him make the most of it." *Page 154 
The question presented for our consideration: Was the alleged editorial actionable per se?
The action of plaintiff is based on the editorial of 23 February, 1926, and not on the editorial of 24 March, 1926.
In the present action the defendants made a motion in the court below for judgment as in case of nonsuit, which the court allowed. We cannot so hold.
On a motion to nonsuit, the evidence is to be taken in the light most favorable to plaintiff, and he is entitled to the benefit of every reasonable intendment upon the evidence, and every reasonable inference to be drawn therefrom.
There is no dispute about the publication. It is not a privileged communication, the only question, is it libelous per se?
An action for libel may always be brought when the words published expose the plaintiff (1) to contempt, hatred, scorn or ridicule; or (2) are calculated to injure him in his office, profession, calling, or trade.
"Everything printed or written which reflects on the character of another, and is published without lawful justification or excuse, is a libel, whatever the intention may have been. It is a tort which consists in using language which others, knowing the circumstances, would reasonably think to be defamatory of the person complaining of and injured by it. The words need not necessarily impute disgraceful conduct to the plaintiff; it is sufficient if they render him contemptible or ridiculous. . . . Or which have a tendency to injure him in his office, profession, calling, or trade. . . . And so, too, are all words which hold the plaintiff up to contempt, hatred, scorn, and ridicule, and which, by thus engendering an evil opinion of him in the minds of right-thinking men, tend to deprive him of friendly intercourse and society, such as an imputation of scoundrelism." Newell, Slander and Libel (4 ed.), pp. 8, 9. Shirley's Leading Cases on the Common Law, 3d Eng. Ed., p. 335; 25 Cyc., pp. 326, 327, 328, 329; 36 C. J., p. 1180; Morey v. Morning Journal Asso., 123 N.Y., p. 207; Sidney v. McFaddenNewspaper Pub. Co., 242 N.Y. 208, 151 N.E. Rep., p. 209; Gattis v.Kilgo, 128 N.C. p. 424; Paul v. Auction Co., 181 N.C. p. 1; Hedgepethv. Coleman, 183 N.C. p. 309; Deese v. Collins, 191 N.C. p. 749. In Hallv. Hall, 179 N.C. at p. 573, it is said: "The defendant fails to note the distinction between oral and written slander, or libel, the latter being actionable if it tends `to render the party liable to disgrace, ridicule, or contempt, and it need not impute any definite infamous crime. Simmons v.Morse, 51 N.C. 7.' Brown v. Lumber Co., 167 N.C. 11."
"Many of the statements testified to by the witnesses, and which the jury must have found were made by the defendant, imputed, not a lack of skill in a particular case, but general ignorance of medical science, *Page 155 
incompetency to treat diseases and a general want of professional skill. Such statements, made in respect to a practicing physician, are slanderous and actionable without proof of special damages." Cruikshank v. Gordon, 118 N.Y. Rep., at p. 183.
"To impute duncehood or want of scholarship to a member of either of the learned professions touches his profession. Cook's Law of Defamation, 18;Peard v. Jones, Cro. Car., 382. "It is libelous per se to publish in a Polish newspaper of a physician largely patronized by Poles, that he is a `blockhead or fool,' adding, `Can we entrust ourselves and our families to his care when he so hates them that he would not help a man if he could?'Krug v. Pitass, 162 N.Y. 154, 56 N.E. 526, 76 Am. St. Rep., 317." 4 Newell, Slander and Libel (4 ed.), p. 20. Vol. 50, Central Law Journal, p. 362.
"Words touching a clergyman in his profession are actionable per se. Words are often actionable when spoken of clergymen which would not be so if spoken of others. But it does not follow that all words which tend to bring a clergyman into disrepute, or which merely impute that he had done something wrong, are actionable without proof of special damage. The reason always assigned for this distinction between clergymen and others is that the charge, if true, would be ground of degradation or deprivation. The imputation, therefore, must be such as, if true, would tend to prove him unfit to continue his calling, and therefore tend more or less directly to proceedings by the proper authorities to silence him." Newell, supra, part sec. 144, p. 176. 3 Lawson, Rights, Remedies and Practice, sec. 1255; 25 Cyc., p. 335; Chaddock v. Briggs, 13 Mass. 248; 7 Am. Dec., 137; Remsen v.Bryant, 56 N.Y. Sup., p. 728.
In Lawson, supra, it is said: "Though a charge of immorality, not amounting to an indictable crime, is not actionable per se, there is an exception in the case of clergyman or priest. Ministers of the Gospel, being teachers and exemplars of moral and Christian duty, a pure and unspotted moral character is absolutely necessary to their usefulness. . . . His whole life, and not the hours he is engaged in the pulpit, is watched and closely scrutinized. As said in Chaddock v. Briggs, 13 Mass. 248, `He is separated from the world by his public ordination, and carries with him constantly, whether in or out of the pulpit, superior obligations to exhibit in his whole deportment the purity of that religion which he professes to teach.' "
In the Chaddock case, supra, it was held actionable per se to charge a clergyman with drunkenness.
The language in the following cases was held actionable per se: "He preacheth nothing but lies and malice in the pulpit." Crauden v. Walden, 3 Lev., 17, 9 Bac. Abr., 48. *Page 156 
"I have always known that he was unfit for the ministry, and an improper person to be allowed to preach, and was too dangerous and indiscreet."Flanders v. Daley, 120 Ga. 885, 48 S.E. 327.
To publish of a man that he "is a very miserable fellow; no man in this community would say that it is possible for us to injure him to the extent of six cents; the community could hardly despise him worse than they now do." Brown v. Remington, 7 Wis. 462.
To write concerning a man, "I look upon him as a rascal, and have watched him for many years." Williams v. Karnes, 4 Humph. (Tenn.), 9.
State that a person had "brainstorms." Hibbon v. Moyer (Tex.),197 S.W. 1117.
A letter written to a third person, calling the plaintiff "a villain."Bell v. Stone, 1 B. and P., 331; 126 Eng. Rep., p. 933.
In Simmons v. Morse, 51 N.C. at p. 7, it is said: "Hence, to publish, in writing, that a person is a swindler, or a Hypocrite, or an itchy oldtoad, has been held to be libelous."
The analysis of the article: It must be read in the setting. It indicates that theretofore the Rev. James R. Pentuff, pastor in charge of the McGill Street Baptist Church of Concord, N.C. had appeared before the General Assembly — the legislative committee on education. The heading of the editorial speaks of him as "Pentuff"; again it speaks of him as "one Pentuff"; again, "Pentuff"; then again, "For Pentuff . . . is the same chap," so "unmannerly," so "discourteous," the chairman had to"suppress him." "There has not to our knowledge appeared in public within the memory of the present generation of North Carolinians (1) a moreignorant man than Pentuff; (2) or one less charitable towards men who might honestly disagree with him. If Fuquay Springs will insist on taking the word of an immigrant ignoramus against that of men of proven character and intelligence, such as," etc. The permissible implication being that he, being an immigrant ignoramus, his character needed to be proven. Webster defines "Ignoramus" to mean "An ignorant person, a vain pretender to knowledge, a dunce."
"A publication claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it. So the whole item, including display lines, should be read and construed together, and its meaning and signification thus determined. When thus read, if its meaning is so unambiguous as to reasonably bear but one interpretation, it is for the judge to say whether that signification is defamatory or not. If, upon the other hand, it is capable of two meanings, one of which would be libelous and actionable and the other not, it is for the jury to say, under all the circumstances surrounding its publication, including extraneous facts admissible in *Page 157 
evidence, which of the two meanings should be attributed to it by those to whom it is addressed or by whom it may be read." Commercial Publishing Co.v. Smith, 149 F. 704, 706, 707. Peck v. Tribune Co., 214 U.S. 185,190; Washington Post Co. v. Chaloner, 250 U.S. Rep. at p. 293.
It is contended by defendants that the editorial of 23 February, 1926, upon which the action is founded: "The language must particularly affect the libelee in his occupation or profession. The editorial herein does not refer to the plaintiff's profession as a minister. The defendants submit that the article did not attack the plaintiff in his professional capacity, and therefore no cause of action was stated on that basis."
Newell, Slander and Libel (4 ed.), pp. 286-287, says: "Also, whenever the words of a libel are ambiguous, or the intention of the writer equivocal, subsequent libels are admissible in evidence to explain the meaning of the first, or to prove the inuendoes, even although such subsequent libels be written after action brought."
The editorial of 24 March, 1926, makes clear any ambiguity in the first article and the unequivocal intention of the writer. The editorial of 23 February, 1926, it may be noted, referred to plaintiff as having been president of a college and compared him with two well-known ministers, one a college president and the other a former college president, of the same denomination, to his discredit. This would indicate that even in the first editorial, defendants were referring to plaintiff in his calling. The subject of the editorial is one discussed by clergymen in their vocation or calling. Morasse v. Brodin, 151 Mass., p. 567; Ohio and M. Ry. Co. v. PressPub. Co., 48 Fed. Rep., p. 206. We think the editorial libelous per se on two grounds, that they expose plaintiff (1) to contempt, hatred, scorn or ridicule; (2) calculated to injure him in his vocation or calling as a minister of the Gospel.
Const. of N.C. Art. I, sec. 20: "The freedom of the press is one of the great bulwarks of liberty, and therefore ought never to be restrained, but every individual shall be held responsible for the abuse of the same."
"In its broadest sense, freedom of the press includes not only exemption from censorship, but security against laws, enacted by the legislative department of the Government, or measures resorted to by either of the other branches for the purpose of stifling just criticism or muffling public opinion. Black Const. Law, pp. 472, 473; Cooley Const. Lim., pp. 517, 518; Ordinaux Const. Leg., p. 236, et seq.; 3 Story Const., p. 731."Cowan v. Fairbrother, 118 N.C. at p. 416.
Const. of N.C. Art. I, sec. 35: "All courts shall be open; and every person for an injury done him in his lands, goods, person, or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay." *Page 158 
"Section 35, Article I, guarantees that every person shall have through the courts, `for an injury to his lands, goods, person, or reputation.' He is entitled by constitutional right to have such injury determined and the amount of just compensation for his wrong settled by a jury of his peers."Osborn v. Leach, supra, at p. 639.
Mr. Justice Sanford, in Gitlow v. New York, 268 U.S. at p. 666, says: "It is the fundamental principle, long established, that the freedom of speech and of the press which is secured by the Constitution does not confer an absolute right to speak or publish, without responsibility, whatever one may choose, or an unrestricted and unbridled license that gives immunity, and prevents the punishment of those who abuse this freedom. 2 Story, Const. (5 ed.), sec. 1580, p. 634, and numerous authorities. . . . Reasonably limited, it is said by Story, in the passage cited, this freedom is an inestimable privilege in a free government; without such limitation, it might become the scourge of the republic."Whitney v. California, U.S. Sup. Court Advance Opinions. 1 June, 1927, p. 675, 71 Law Ed.
"In Burris v. Bush, 170 N.C. p. 395, it is said: `The statute (Rev., sec. 502, now C. S., 542), permits a defendant in actions for libel or slander to allege "both the truth of the matter charged as defamatory and any mitigating circumstances to reduce the amount of damages; and, whether he prove the justification or not, he may give in evidence the mitigating circumstances," but, in the absence of a plea in justification or mitigation, evidence of the truth of the charge is incompetent. Upchurch v.Robertson, 127 N.C. 128; Dickerson v. Dail, 159 N.C. 541.' " Elmore v.R. R., 189 N.C. at p. 673.
The defendants, in their answer, plead that the editorial of which plaintiff complains was true, under C. S., 542. The editorial, as heretofore stated, was libelous per se. The defendants did not avail themselves of the privilege given them under the "London Libel Law"; therefore, the damages that may be awarded would include punitive as well as actual damages.
Mr. Blackstone, in his Commentaries, Book 3, ch. 8, part sec. 125, gives the reason why libel is made indictable and an action at law can be sustained: "A second way of affecting a man's reputation is by printed or written libels, pictures, signs, and the like; which set him in an odious or ridiculous light, and thereby diminish his reputation. With regard to libels in general, there are, as in many other cases, two remedies: one by indictment, and the other by action. The former for the public offense; forevery libel has a tendency to the breach of the peace, by provoking theperson libeled to break it (italics ours); which offense is the same (in point of law), whether the matter contained be true or false; and therefore the defendant, on an indictment for publishing *Page 159 
a libel, is not allowed to allege the truth of it by way of justification. But in the remedy by action on the case, which is to repair the party in damages for the injury done him, the defendant may, as for words spoken, justify the truth of the facts, and show that the plaintiff has received no injury at all."
Sanborn, Circuit Judge, in Times Pub. Co. v. Carlisle, 94 Fed. Rep., at p. 765, in a libel action, well says: " `A good name is rather to be chosen than great riches, and loving favor rather than silver and gold.' The respect and esteem of his fellows are among the highest rewards of a well-spent life vouchsafed to man in this existence. The hope of them is the inspiration of his youth, and their possession the solace of his later years. A man of affairs, a business man, who has been seen and known of his fellow-men in the active pursuits of life for many years, and who has developed a good character and an unblemished reputation, has secured a possession more useful and more valuable than lands, or houses, or silver, or gold. Taxation may confiscate his lands, fire may burn his houses, thieves may steal his money, but his good name, his fair reputation, ought to go with him to the end — a ready shield against the attacks of his enemies, and a powerful aid in the competition and strife of daily life."
For the reasons given, the judgment must be
Reversed.