Argued March 15, reargued September 6, affirmed October 18, 1961

# HOLDEN *v.* PIONEER BROADCASTING COMPANY ET AL

365 P. 2d 845

*Philip A. Levin,* Portland, argued the cause for appellant. With him on the brief were Rader & Kitson, Portland, and Peterson & Lent, Portland.

*James H. Clarke,* Portland, argued the cause for respondents. With him on the brief were Koerner, Young, McColloch & Dezendorf and Wayne Hilliard, Portland.

Before ROSSMAN, J., presiding, and WARNER, PERRY, SLOAN, O'CONNELL, GOODWIN and LUSK, Justices.

O'CONNELL, J.

This is an action to recover damages for an alleged libelous statement made by defendants during a television broadcast. The defendant company is the owner of the television station; the individual defendants are the news director and announcer respectively.

The complaint alleges "[t]hat on or about the 30th day of January, 1959, on a certain news broadcast over said television station, Defendants, and each of them, did broadcast and publish a certain photograph of said restaurant operated by Plaintiff and accompanied by words uttered and published by the Grand Jury * * * for the County of Multnomah * * *." The grand jury report referred to a "deplorable situation" involving runaway girls who, it was reported, were

being given aid and assistance by the operators of plaintiff's restaurant and that "these girls soon find themselves engaged in prostitution and similar vices." The complaint further alleges that these utterances were false and libelous and that they were made "willfully, maliciously and wrongfully." Special, general and punitive damages were alleged in the complaint. Defendants moved to strike the allegations of general and punitive damages on the ground that the complaint did not allege that defendants intended to defame plaintiff, or that defendants refused to publish a requested retraction of a non-intentional libel, the pleading and proof of which are conditions precedent to recovery of such damages under ORS 30.155 to 30.175. The trial court granted defendants' motion and, plaintiff failing to plead further, judgment was entered for defendants, from which plaintiff appeals.

■ The statutes material to this appeal are as follows:

"ORS 30.155 Damages recoverable for defamation by radio, television, motion pictures, newspaper or printed periodical. Except as provided in ORS 30.160, in an action for damages on account of a defamatory statement published or broadcast in a newspaper, magazine, other printed periodical, or by radio, television or motion pictures, the plaintiff may recover any general and special damages which, by competent evidence, he can prove to have suffered as a direct and proximate result of the publication of the defamatory statement."

"ORS 30.160 When general damages allowed. (1) In an action for damages on account of a defamatory statement published or broadcast in a newspaper, magazine, other printed periodical, or by radio, television or motion pictures, the plaintiff shall not recover general damages unless:

"(a) A correction or retraction is demanded but not published as provided in ORS 30.165; or

"(b) The plaintiff proves by a preponderance of the evidence that the defendant actually intended to defame the plaintiff.

"(2) Where the plaintiff is entitled to recover general damages, the publication of a correction or retraction may be considered in mitigation of damages."

"ORS 30.165 Publication of correction or retraction upon demand. (1) The demand for correction or retraction shall be in writing, signed by the defamed person or his attorney and be delivered to the publisher of the defamatory statement, either personally or by registered mail at the publisher's place of business or residence within 20 days after the defamed person receives actual knowledge of the defamatory statement. The demand shall specify which statements are false and defamatory and request that they be corrected or retracted. The demand may also refer to the sources from which the true facts may be ascertained with accuracy.

"(2) The publisher of the defamatory statement shall have not more than two weeks after receipt of the demand for correction or retraction in which to investigate the demand; and, after making such investigation, he shall publish the correction or retraction in:

"(a) The first issue thereafter published, in the case of newspapers, magazines or other printed periodicals.

"(b) The first broadcast or telecast thereafter made, in the case of radio or television stations.

"(c) The first public exhibition thereafter made, in the case of motion picture theatres.

"(3) The correction or retraction shall consist of a statement by the publisher substantially to the effect that the defamatory statements previously made are not factually supported and that the publisher regrets the original publication thereof.

"(4) The correction or retraction shall be pub-

lished in substantially as conspicuous a manner as the defamatory statement."

We construe ORS 30.155–30.175 as requiring plaintiff to plead and prove, as a condition precedent to recovery, defendants' intent to defame or, in the absence of such intent, the failure to retract upon demand. *Hall v. Kelly,* 61 Ga App 694, 7 SE2d 290 (1940); Frye, Libel and Slander—Damages—Constitutionality of Statute Limiting Recovery of General Damages in Libel Actions, 36 Or L Rev 70, 77 (1956). Cf., *Oregon Liquor Control Comm'n. v. Anderson Food Markets, Inc.,* 160 Or 646, 87 P2d 206 (1939); *Smith v. Laflar,* 137 Or 230, 2 P2d 18 (1931); Annotation, 130 ALR 440 (1941). We also construe the statute to be applicable to actions brought against the individual agents and employees of the owner or operator of the designated types of news media, if the defamatory publication is made in the course of the employment. *Pridonoff v. Balokovich,* 36 Cal2d 788, 228 P2d 6 (1951).

■ Plaintiff contends that the foregoing statutes, in purporting to eliminate the right of a defamed person to recover general damages for an inadvertent libel when a retraction is made, are unconstitutional under Article I, §§ 8, 10, and 20 of the Oregon Constitution,① and under the due process and equal protection clauses of the fourteenth amendment to the federal constitution.

---

① "Section 8. Freedom of speech and press. No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

"Section 10. Administration of justice. No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation."

"Section 20. Equality of privileges and immunities of citizens. No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

The constitutionality of statutes of a similar nature has been passed upon in other states. In a majority of the cases in which the question has been raised the courts have held, or stated in dicta, that the denial of the remedy of general damages for defamation is unconstitutional. The contrary view is taken in *Allen v. Pioneer Press Co.*, 40 Minn 117, 41 NW 936 (1889) and *Werner v. Southern California Associated Newspapers,* 35 Cal2d 121, 216 P2d 825, 13 ALR2d 277 (1950), appeal dismissed, 340 US 910, 71 S Ct 290, 95 L Ed 657 (1951). The cases are collected in 13 ALR2d 277.

The retraction statutes in the several states vary in the extent to which they remove the defamed person's remedy,[②] but the constitutional attack upon these statutes has been essentially the same as that urged by plaintiff in the case at bar, it being contended that the denial of a remedy by way of general damages is repugnant to the due process and equal protection clauses of the fourteenth amendment and repugnant to the sections of the state constitutions declaring that persons abusing the right of freedom of expression shall be responsible (e.g., Art. I, § 8, Oregon Constitution) and repugnant to the sections guaranteeing a remedy for defamation (e.g., Art. I, § 10, Oregon Constitution).

Plaintiff's central point of attack is based upon the guarantee in Art. I, § 10, Oregon Constitution, that "every man shall have remedy by due course of law for injury done him in his person, property or reputation." It is contended that retraction is not a substitute for the remedy of general damages and that, therefore, the constitution is violated. This and the other consti-

---

[②] See a summary of the various statutes in Note, Developments In the Law of Defamation, 69 Harv L Rev 875, 941 (1956). See also, Leflar, Legal Remedies for Defamation, 6 Ark L Rev 423, 437 (1952).

tutional objections raised by plaintiff are carefully analyzed in two excellent opinions; one by Mr. Justice Traynor in *Werner v. Southern California Associated Newspapers, supra,* and the other by Mr. Justice Mitchell in *Allen v. Pioneer Press Co., supra.* Although the statutes and constitutional provisions dealt with in the Werner and Allen cases are not precisely the same as ours, the basic constitutional problems presented are the same.[9] We agree with the courts' analysis in these cases and adopt it as dispositive of the case at bar.

It is not necessary to repeat what was there expressed. In the Werner case the court held that the enactment of the California retraction statute (Civil Code § 48a) was the result of a legislative determination and choice based upon the resolution of considerations of certain matters of policy which were within the province of the legislature. The statutory scheme enacted in ORS 30.160–30.170 is the result of similar considerations. Unless it is clear that the legislature exceeded the constitutional bounds within which it has the power to exercise its policy making functions we must hold this legislative choice to be valid.

Were we to hold that the legislature cannot constitutionally modify the remedies available to a person who contends that he has been defamed we would, in effect, freeze the law of defamation in the form in which it existed at the time our constitution was

[9] The Minnesota statute dealt with in the Allen case required the publisher to prove good faith. This was interpreted to require the publisher to be free from negligence. Thorson v. Albert Lea Publishing Co., 190 Minn 200, 215 NW 177, 90 ALR 1169 (1933). The fact that a retraction statute does not place upon the publisher the burden of proving good faith or freedom from negligence does not, in our opinion, render a retraction statute unconstitutional.

The California statute in question in the Werner case was interpreted as allowing retraction to limit recovery to special damages even where the defamation was malicious or reckless. It is not necessary for us to decide whether we would uphold a statute of this type.

adopted. And, logically, such a holding would congeal the remedies for *all* actions, whether arising out of the law of defamation or any other area of the law. The effect would be to preclude the legislature from modifying the fault principle in tort law, at least to the extent that it would affect the remedy of a plaintiff. Thus, the legislature would be powerless to effect a change in the law were it to decide that the interests of the state would be better served if the principle of absolute liability as a theory of tort liability in a particular type of case (or in all cases) should be abolished, or if it were to decide that in a particular situation liability should be limited to cases in which defendant intended to cause the harm; in other words, that liability for negligent or ultrahazardous conduct would be abrogated. In this connection it will be noted that ORS 30.160–30.170, in effect, simply changes the law of defamation, as it relates to a certain class of persons, by eliminating absolute liability and liability for negligence in preparing and publishing a defamatory statement (unless defendant refuses to retract). Liability is restricted to cases of intentional conduct where the defendant intends to defame the plaintiff. We repeat, if the legislature cannot modify the fault principle in defamation cases it cannot modify it in other areas of tort liability. To require such a conclusion would impose a stricture upon our law which could not have been contemplated in the adoption of our constitution.

In the past this court has recognized that the legislature may limit the remedy previously available to one injured by a tort-feasor. We have held that the legislature can take away the remedy for negligent injury in actions brought by an automobile guest against his host. *Perozzi v. Ganiere,* 149 Or 330, 40

P2d 1009 (1935). The same result obtains under the federal constitution, *Silver v. Silver,* 280 US 117, 50 S Ct 57, 74 L Ed 221, 65 ALR 939 (1929).

In the latter case the court said that "the Constitution does not forbid the creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible legislative object." (280 US 122). Article I, § 10 of the Oregon Constitution was similarly construed in *Noonan v. City of Portland,* 161 Or 213, 88 P2d 808 (1939). In that case the court sustained a charter provision exempting the city from damage or loss to a person or property suffered by reason of the defective condition of any sidewalk, as against a claim that the charter provision contravened Article I, § 10. A remedy was reserved against the negligent city officer and the property owner. The court, speaking through Mr. Justice ROSSMAN, said:

> "Article I, § 10, Oregon Constitution, was not intended to give anyone a vested right in the law either statutory or common; nor was it intended to render the law static. Notwithstanding similar constitutional provisions in other states, the courts have sustained statutes which eliminated the husband's common law liability for the torts of his wife and which placed the wife upon an economic level with her husband. They have likewise sustained statutes which have abolished actions for alienation of affections, actions for breach of promise, etc." 161 Or 249.

See also, *Smith v. Smith,* 205 Or 286, 287 P2d 572 (1955).

The plaintiff argues that guest statutes and other statutes restricting or wholly abrogating remedies in certain types of cases (alienation of affection, seduction, breach of contract to marry) deal with the remedies of persons who have the attributes of a volun-

teer and, therefore, such statutes can be distinguished from legislation such as ORS 30.160–30.170 where the person suing has not chosen to expose himself to the harm visited upon him. The distinction is not substantial in this context. We cannot believe that the constitutional provisions relied upon were intended to preclude legislative change in tort remedies unless the injured person was in some sense a "volunteer." If there is substance in the suggested distinction, there is no reason to conclude that the legislature did not weigh it when considering the advisability of enacting ORS 30.160–30.170.

If the legislature can limit a person's remedy to cases in which there has been an intentional defamation, which we believe that it can, then of course it can take a less drastic step and absolve a defendant from liability for general damages resulting from the non-intentional preparation and publication of harmful statements, upon the condition that he publish a requested retraction.

Assuming that the legislature does not have the power to deprive a person of an existing remedy, it would be conceded by plaintiff that the form of the remedy could be changed if the substitute was a substantial equivalent of that which was taken. But plaintiff argues that a remedy by way of retraction is not the substantial equivalent of money damages. The contrary view has been taken by others. In *Allen v. Pioneer Press Co.,* 40 Minn 117, 41 NW 936, 938 (1889), the court said:

> "* * * Now, as far as vindication of character or reputation is concerned, it stands to reason that a full and frank retraction of the false charge, especially if published as widely and substantially to the same readers as was the libel, is usually in

fact a more complete redress than a judgment for damages. Indeed, where there has been perfect good faith, and an entire absence of improper motives, in the publication of a libel, and no special or pecuniary injury has resulted, an action for damages, brought after such a full and frank retraction and apology, is in a majority of cases purely speculative."

It is argued that our constitution, in preserving remedies through "due course of law," assures the injured person a remedy by court action if he should elect to pursue it and that, therefore, the constitution renders invalid the remedy by way of retraction even though it be conceded that such a remedy is more effective than a judgment for damages in assuaging the harm suffered by the plaintiff. This puts a stringent interpretation on Art. I, § 10. Conceding, for the purpose of answering this point, that retraction is not a remedy by "due course of law," the fact remains that the injured plaintiff does have a remedy by "due course of law" under ORS 30.155–30.160 if he is intentionally defamed. Unless it can be said that liability for injury to reputation resulting from negligent conduct or from conduct wholly without fault must be preserved under our constitution, there is no need to inquire whether retraction is an adequate remedy; there would be a remedy by due course of law available to those who are intentionally defamed, and the right of retraction would simply be an additional remedy which the legislature could provide or withhold as it deems wise. But even if the right to retraction was the sole remedy available to a person defamed, that remedy would be by due course of law. The term "due course of law" need not be given a limited meaning, requiring some form of judicial procedure to test the *effective-*

*ness* of the retraction in rehabilitating the plaintiff's reputation in a particular case.

Implicit in the argument that court surveillance must be available to assess damages is the assumption that, whereas the remedy by way of retraction may prove inadequate in a particular case, the remedy in the form of money damages can be adjusted by a judicial tribunal to equate the dollar recovery to the harm suffered by the person defamed. The harm to a plaintiff is likely to be irreparable either by way of money recovery or through retraction. It is a pure speculation to say that the one remedy is more reparable than the other. As already indicated, there is a respectable view that retraction is a more effective remedy than a judgment for money damages. The legislature may have arrived at the same conclusion in substituting retraction for general damages. The legislature may also have considered that in each case the benefit to the plaintiff from a retraction would be equated to the harm as closely as money damages fixed by a court. It cannot be said that the legislature had no foundation for concluding that retraction was an adequate substitute for general damages.

There are also other policy considerations involved in the choice. In *Werner v. Southern California Associated Newspapers, supra,* 35 Cal2d at 126, the court said:

> "There are at least two bases on which the Legislature could reasonably conclude that the retraction provisions of section 48a provide a reasonable substitute for general damages in actions for defamation against newspapers and radio stations, namely, the danger of excessive recoveries of general damages in libel actions and the public interest in the free dissemination of news.
> "General damages are allowed for 'loss of repu-

tation, shame, mortification and hurt feelings,' (Civ. Code, § 48a), but the extent of such injuries is difficult to determine. At common law it was conclusively presumed that general damages resulted from the publication of a libel. 'The practical result is that the jury may award not only nominal damages, but substantial sums in compensation of the supposed harm to the plaintiff's reputation, without any proof that it has in fact occurred.' (Prosser, Torts, § 92, p. 797.) The Legislature could reasonably conclude that recovery of damages without proof of injury constitutes an evil."

We hold that ORS 30.150 through 30.175 does not constitute an unconstitutional deprivation of the remedy for defamation.

Plaintiff's argument that the retraction statute creates an unlawful classification in violation of the equal protection clauses of the federal and the Oregon constitutions is adequately answered in the Werner case.

■ Plaintiff next contends that the trial court erred in granting defendants' motion to strike from plaintiff's complaint the allegations relating to punitive damages.

Defendants' argue that the trial court's order can be sustained on either one of two grounds: (1) that the Oregon retraction statutes (ORS 30.150 to 30.175) contain no mention of punitive damages, which, it is argued, reflects the legislative design to eliminate the doctrine of punitive damages from this class of cases; or (2) that, conceding that the statutes do not bar the recovery of punitive damages in the proper case, the complaint in the instant case did not contain sufficient allegations to sustain a recovery of punitive damages.

We are of the opinion that defendants' second ground is well taken. It is not necessary, therefore, to

decide whether our retraction statutes permit the recovery of punitive damages. The allegations in the complaint do not purport to charge defendants with the intent to defame plaintiff. The recitation that the "utterances and publication were made by defendants willfully, maliciously and wrongfully" is not to be construed as an allegation that defendants knew that the charges were false or that defendants were motivated by ill will in making the alleged defamatory statement. The allegation that the statement was made "willfully, maliciously and wrongfully" is a mere conclusion of the pleader. The allegation is not sufficient to charge malice in fact.[4]

■ One point relied upon in the dissent requires comment. The dissent argues that the deprivation of the remedy in the present case is as objectionable from a constitutional standpoint as legislation purporting to fix a certain price per acre as "just compensation" in eminent domain cases. The analogy is not apposite. Certainly it would be beyond the constitutional power of the legislature to fix a single recovery in dollars for all parcels of land condemned irrespective of the value of each parcel. But the damage resulting from the taking of property is admittedly a money damage and obviously the recovery must be measured in each case according to a certain number of dollars. The harm for which "general damages" purports to be the remedy in defamation cases is of a different sort. By definition "general damages" as distinct from "special damages" are those which are not measurable by proof of specific pecuniary loss. The remedy of general damages purports to compensate the plaintiff for a harm

[4] Glenn v. Gibson, 75 Cal App2d 649, 171 P2d 118 (1946); Jackson v. Underwriters' Report, Inc., 21 Cal App2d 591, 69 P2d 878 (1937); Locke v. Mitchell, 7 Cal2d 599, 61 P2d 922 (1936); Taylor v. Lewis, 132 Cal App 381, 22 P2d 569 (1933). Cf., Butler v. Freyman, 216 Mo App 636, 260 SW 523 (1924).

to his reputation—a harm which is not measurable in a money loss and which is not mitigated by a money judgment except to the extent that the entry of the judgment communicates the message that the words printed were false. The remedy afforded through retraction would seem to come closer to providing an effective means of repairing the harm resulting from the defamation. There is no comparable available remedy in eminent domain cases because there is no legally protected interest in the landowner other than the pecuniary interest represented by the market value of the land. The condemnee has no right to regain his land. Compensation, not reparation, is the function of condemnation awards; from the nature of such cases it is impossible to restore the status quo ante. But in defamation cases there is a choice of remedies and it is not for the courts to decree that the defamer must "purchase" the reputation of his victim to the extent of the harm which the defamer has caused him (assuming that it could be ascertained) rather than make reparation by way of publishing a satisfactory retraction. Retraction being an available and apparently effective remedy in defamation cases, it was within the power of the legislature to provide for its use. It would be reasonable for the legislature to assume that the greater the libel the greater the effect that a retraction would have in rehabilitating the plaintiff. Thus the remedy automatically adjusts itself to the harm. The fact that such remedy or such adjustment is not perfect does not prohibit the legislature from making it the exclusive remedy in the class of cases covered by the statute. If the legislatively designed remedy is an effective remedy, there is nothing in the constitution requiring that the guaranty of a "remedy" by "due course of law" for injuries to repu-

tation shall take the form of a judicial adjustment of the remedy in each case.

The judgment of the lower court is affirmed.

GOODWIN, J., dissenting.

The majority holds that ORS 30.155 through 30.175 is consistent with Article I, § 10, Oregon Constitution. I cannot agree.

Constitutional commentators of all persuasions grant that written constitutions having such sections are intended to place the rights of the individual beyond invasion by temporary parliamentary majorities. 2 Cooley, Constitutional Limitations (8th ed, 1927) 733-738; *Griffin v. Mixon,* 38 Miss 424; *Dorman v. The State,* 34 Ala 216; *Hotchkiss v. Porter,* 30 Conn 414; *Park v. Free Press Co.,* 72 Mich 560, 40 NW 731, 1 LRA 599.

The supremacy of the constitution, as law, and not merely as good advice, has been forcefully underscored in our own cases:

"* * * The right of personal security which has been transmitted to us from Magna Charta, and incorporated into the fundamental law of this state, guarantees to every member of society the preservation of his good name from detraction, and for any infringement of this right the law provides an adequate remedy * * * [citing Oregon Constitution, Art I, § 10]." *Thomas v. Bowen,* 29 Or 258, 264, 45 P 768.

"* * * [Article I, § 10] was intended to preserve the common-law right of action for injury to person or property, and while the legislature may change the remedy or form of procedure, attach conditions precedent to its exercise, and perhaps abolish old and substitute new remedies * * * [citing cases], it can not deny a remedy entirely * * *." *Mattson v. Astoria,* 39 Or 577, 580, 65 P 1066.

"\* \* \* [E]ver since the cases of *Mattson v. Astoria* [supra] \* \* \* and *Batdorff v. Oregon City*, 53 Or. 402 (100 Pac. 937, 188 Ann. Cas. 287, 8 N.C.C.A, 142, note), it has been the settled law of this state that the common-law remedy for negligently inflicted injuries could not be taken away without providing some other efficient remedy in its place \* \* \*." *West v. Jaloff*, 113 Or 184, 195, 232 P 642, 36 ALR 1391.

As Judge Deady inquired in *Eastman v. County of Clackamas*, 32 F 24 (D Or, 1887), quoted by this court in *Theiler v. Tillamook County*, 75 Or 214, 146 P 828, and in *Stewart v. Houk et al*, 127 Or 589, 271 P 998, 272 P 893, 61 ALR 1236:

"\* \* \* Can the legislature, in some spasm of novel opinion, take away every man's remedy for slander, assault and battery, or recovery of a debt? and, if it cannot do so in such cases, why can it in this?" 32 F 24, supra at 32.

The Oregon retraction statute abolishes general damages except in cases of proven malice or failure to retract after request. The statute leaves the defamed no remedy other than retraction for a negligent destruction of reputation.

The challenged legislative scheme requires the plaintiff to give notice within 20 days of knowledge of his grievance. Thereafter, the option is with the defendant either to retract or be sued. The plaintiff has a "remedy in due course of law" in the sense that the law gives the plaintiff a day in court, but only if the defendant refuses to retract.

Prior to the enactment of the challenged statute, the decisions of this court recognized the general rule that, where a publication is libelous *per se,* general damages will be presumed as a consequence of publication. *Grubb v. Johnson et al.,* 205 Or 624, 289 P2d

1067; *Marr et al. v. Putnam et al.,* 196 Or 1, 246 P2d 509; *Peck v. Coos Bay Times Pub. Co. et al.,* 122 Or 408, 259 P 307; *Barnett v. Phelps,* 97 Or 242, 191 P 502, 11 ALR 663; 33 Am Jur, Libel and Slander 222, § 243 and 263, § 282; 53 CJS 362, Libel and Slander, § 239. Special damages, where recoverable, depend upon pleadings and proof. *DeLashmitt v. Journal Pub. Co.,* 166 Or 650, 114 P2d 1018, 135 ALR 1175. And see McCormick, Damages (1935) 421-425.

There is no question of the authority of the legislature to experiment with common-law remedies. *Noonan v. City of Portland,* 161 Or 213, 88 P2d 808; *Perozzi v. Ganiere,* 149 Or 330, 40 P2d 1009; *Mattson v. Astoria,* supra. In the *Perozzi* case, we quoted from the opinion of the United States Supreme Court in *Silver v. Silver,* 280 US 117, 122, 50 S Ct 57, 74 L Ed 221, 65 ALR 939:

"* * * [T]he Constitution does not forbid the creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible legislative object * * *."

I would not depart from this rule. It is only a truism to add that in changing remedies the legislature must do so in such a way as to leave intact the substantial rights guaranteed by the constitution.

Remedy for injury to reputation, protected by Article I, § 10, must be a real and substantial remedy, not merely a colorable one, *Mattson v. Astoria,* supra, *West v. Jaloff,* supra, so that the rights guaranteed by the constitution are not merely false promises. A substantial remedy is one in which the law, as best it can, either restores the status quo or compensates the injured party for the loss. In some situations there are equitable remedies. In others damages are

the pecuniary consequences which the law imposes for the breach of a duty or the violation of a right. *Deane v. Willamette Bridge Co.,* 22 Or 167, 172, 29 P 440, 15 LRA 614. Damages may include mental, as well as physical, suffering. *Fehely v. Senders,* 170 Or 457, 135 P2d 283, 145 ALR 1092.

Reasonable minds might well disagree on the efficiency or desirability of a retraction in comparison with money damages. See Note, 69 Harv L Rev 877, 940. I agree that for some defamed persons, sincerely interested in vindication, a retraction might be an even better remedy than some trifling verdict. It may be assumed equally that for other defamed persons a retraction would do little good, possibly would compound the harm, and only rarely would reach the same public reached by the original defamation. See Morris, *Inadvertent Newspaper Libel and Retraction,* 32 Ill L Rev 36. However, such considerations are beside the mark unless the remedy afforded by the challenged statute is a remedy at law as demanded by the constitution.

The meaning of due course of law was explained by Daniel Webster in his celebrated argument in *Dartmouth College v. Woodward,* 17 US (4 Wheaton) 518, 581, 4 L Ed 629:

> "* * * By the law of the land, is most clearly intended, the general law; a law, which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial. * * * If this were [not] so, acts of attainder, bills of pains and penalties, acts of confiscation, acts reversing judgments, and acts directly transferring one man's estate to another, legislative judgments, decrees and forfeitures, in all possible forms, would be the law of the land * * *."

The principles found in the *Dartmouth College* case are relied upon in *Hanson v. Krehbiel,* 68 Kan 670, 75 P 1041, 64 LRA 790. And see the discussion in 2 Cooley, Constitutional Limitations, supra, 733-741, and *Griffin v. Mixon,* 38 Miss 424, supra.

The retraction statute affords the plaintiff no individual hearing or trial to determine the adequacy of a remedy in any case. Whether the retraction has restored a reputation or further beclouded it remains a mystery. The "remedy" rather operates automatically to close the doors of the court. The legislature has arbitrarily declared that a decision to retract, rendered by the tort-feasor, shall be the exclusive remedy. The retraction is not "given" by the statute; it is merely converted from a defense in mitigation to a defense in bar.

It is settled that the legislature may not declare a certain price per acre to be "just compensation" for a massive taking of land in divers ownership under eminent domain. To do so would deny the individual owner a trial to determine just compensation for the loss of his specific property. E.g., *Hood River L. Co. v. Wasco County,* 35 Or 498, 57 P 1017; *Branson v. Gee,* 25 Or 462, 36 P 527, 24 LRA 355; *Bragg v. Weaver,* 251 US 57, 40 S Ct 62, 64 L Ed 135; *Backus v. Fort Street Union Depot Co.,* 169 US 557, 18 S Ct 445, 42 L Ed 853. See 2 Cooley, Constitutional Limitations, supra, 743, 758, 1207; 1 Davis, Administrative Law 420, § 7.04.

Similarly, the legislature can not declare that retraction shall be the exclusive remedy for the loss of the constitutionally protected interest in one's reputation. Due course of law requires an individual hearing to determine whether retraction has in fact restored the plaintiff's reputation or merely aggravated the

wrong. The statute is a legislative judgment that the plaintiff has been made whole. But the constitution is speaking of personal rights and not of fungible goods. The ancient rule that there must be a day in court has not been abrogated by the fact that the law does not guarantee that any given judgment can be collected on execution. *Hanson v. Krehbiel,* 68 Kan 670, supra.

As will be seen, the majority is justified in relying upon only one case which has passed upon the constitutionality of a similar statute. *Werner v. Southern Cal. etc. Newspapers,* 35 Cal2d 121, 216 P2d 825, 13 ALR2d 252, appeal dismissed 340 US 910, 71 S Ct 290, 95 L Ed 657. Before discussing that decision, it may be instructive to consult the authorities elsewhere.

In *Moore v. Stevenson,* 27 Conn 14, the statute provided "[t]hat in every action for an alleged libel, the defendant may give proof of intention; and unless the plaintiff shall prove malice in fact, he shall recover nothing but his actual damage proved and specially alleged in the declaration." Connecticut Public Laws 1855, ch LXXVII. The court construed "actual damage" to mean special damages, without recovery for general loss of reputation. It then held, in order to save the constitutionality of the statute, that "malice" would have to include negligence as well as any wrongful state of mind. To the same effect is *Hotchkiss v. Porter,* 30 Conn 414, supra. Our statute does not admit of such a construction in order to save it.

Like the court in *Hotchkiss v. Porter,* the Michigan Supreme Court in *Park v. Free Press Co.,* 72 Mich 560, supra, regarded a substantial legal remedy for defamation as one of the fundamentals of civil order. The statute in that case abolished general and puni-

tive damages in actions against newspapers except in cases of actual malice, charges of crime, or request and refusal to retract. The court's conclusion has often been quoted:

"There is no room for holding in a constitutional system that private reputation is any more subject to be removed by statute from full legal protection than life, liberty, or property. It is one of those rights, necessary to human society that underlie the whole social scheme of civilization * * *.

"* * * * *

"It is not competent for the Legislature to give one class of citizens legal exemptions from liability for wrongs not granted to others; and it is not competent to authorize any person, natural or artificial, to do wrong to others without answering fully for the wrong * * *." 72 Mich at 566, 567.

The Michigan court chose to reach the constitutional issue even though it alternatively held that the particular libel was excluded from the operation of the statute by the exception for criminal charges. Accord, *McGee v. Baumgartner,* 121 Mich 287, 80 NW 21.

In *Allen v. Pioneer-Press Co.,* 40 Minn 117, 41 NW 936, the statute required notice to the defendant of the statement claimed to be defamatory, and if the defendant made the statement in good faith and retracted after notice only special damages were allowed. In order to save the constitutionality of the statute, the court interpreted "good faith" to require freedom from all fault, including negligence. Again we find a court making a substantial revision of the statute in order to save it. Professor Morris, in the article cited supra, says these "mangled" retraction statutes have left the common law substantially unchanged. 32 Ill L Rev at 41.

In *Hanson v. Krehbiel,* 68 Kan 670, supra, the statute barred all but special damages in cases of retraction without actual malice. Section 18 of the Kansas Bill of Rights provided: "All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay." The court held that under "due course of law" one could no more be deprived of his reputation than of his property by the self-executing mandate of the legislature.

"* * * We could not excuse ourselves for holding that reputation is less valuable that [sic] property, or that by the quoted provision of the bill of rights it is less protected from spoliation.
"* * * * *

"It is not an easy matter to deduce, either from reason or the authorities, a satisfactory definition of 'law of the land' or 'due course of law'. However, from either standpoint, we feel safe in saying that these terms do not mean any act that the legislature may have passed, if such act does not give to one an opportunity to be heard before being deprived of property, liberty, or reputation, or, having been deprived of either, does not afford a like opportunity to show the extent of his injury and gives no adequate remedy to recover therefor * * *.
"* * * * *

"The retraction required by the act in question may or may not be full reparation for the injury suffered. It might rather aggravate the injury already inflicted than mollify it. It is sufficient to say, however, that these are all questions for the courts, upon proper notice to all parties, and may not be determined arbitrarily by an act of the legislature * * *." 68 Kans, supra, 674-675.

In *Osborn v. Leach,* 135 NC 628, 47 SE 811, 66 LRA 684, the statute provided that, absent bad faith, unrea-

sonableness, or failure to retract after notice, only "actual damages" could be recovered against a newspaper. Again, in order to preserve the constitutionality of the statute, the court held "actual damages" to include both general and special damages. The court approved *Hanson v. Krehbiel,* supra, and *Park v. Free Press,* supra, and concluded that the North Carolina statute would have been unconstitutional if construed to make retraction the exclusive remedy for loss of reputation. Accord, *Pentuff v. Park,* 194 NC 146, 138 SE 616, 53 ALR 626.

In *Post Pub. Co. v. Butler,* 137 F 723 (6th Cir, 1905), the statute provided:

> " 'If it shall appear at the trial, that the publication complained of was made in good faith, through mistake of fact, but with reasonable ground for believing that the statements therein contained were true and that the publisher upon demand and within a reasonable time thereafter, published a full and complete retraction in as public a manner as that in which said original publication was made, the presumption of malice attaching to or growing out of the publication of said libelous matter shall be thereby rebutted; provided that nothing contained in this act shall prevent the person libelled from alleging and proving actual malice on the part of the publisher and any special damage resulting to him therefrom.' " Rev Stat Ohio, § 5094 (as amended in 1900), as quoted in 137 F at 725.

The Constitution of Ohio provided:

> " 'All courts shall be open, and every person, for an injury done him in his lands, goods, person, or reputation, shall have remedy by due course of law; and justice administered without denial or delay.' " Constitution of Ohio, Art 1, § 16, as quoted in 137 F at 725.

The Sixth Circuit held that a statute barring recovery for loss of reputation upon unilateral retraction would be unconstitutional, and then construed the statute to bar such recovery only in case of an actual request for retraction. The court thought a request for a retraction would be a waiver of the constitutional right to a trial.

"We can see no way of sustaining the constitutionality of this law except by placing upon it the construction contended for by the plaintiff. Not only is a retraction required to put it into operation, but the retraction must be made at the demand of the person libeled. By such demand the injured person waives the remedy he had under the law as it stood, accepts the retraction in lieu of general damages, and consents that he be restricted, in addition to the reparation thus afforded, to a recovery of special damages where he can show actual malice. Under this interpretation he is not deprived of any constitutional right because he consents to the application of the new law to his case. If he does not consent, he still has the remedy under the old law  *  *  *." 137 F at 727.

In *Neafie v. Hoboken Printing & Pub. Co.*, 75 NJL 564, 68 A 146, the court stated:

"If it be argued that the act of 1898 must be construed in the light of the common-law terminology in actions of libel, and that by 'actual damage proved and specially alleged in the declaration' it was intended by the legislature to exclude (in the absence of proof of express malice or the failure to retract the libel upon request) all allowance of compensation for the general injury to plaintiff's reputation, it is sufficient, we think, to say that to adopt such a construction would necessarily render the act unconstitutional. The right of a person to be secure in his reputation against unwarranted attacks such as slanders and libels is a part of the right of enjoying life and pursuing

and obtaining safety and happiness which is guaranteed by our fundamental law. *New Jersey Constitution, art.* 1, *pl.* 1. And the same instrument, in conferring upon every person the right to freely speak, write and publish his sentiments on all subjects, imposes at the same time a responsibility for the abuse of that right. In short, the people of this state, who ordained the constitution, have not empowered the legislative body to authorize a newspaper publisher or any other citizen to unjustifiably injure his neighbor's reputation without making compensation for that injury. Good motives, or the absence of specific malice, are important considerations in mitigation of punitive damages, but they are no answer to a claim for compensatory damages * * *." 75 NJL at 567, 568.

*Byers v. Meridian Ptg. Co.,* 84 Ohio St 408, 95 NE 917, 38 LRA (NS) 913, held unconstitutional a statute apparently barring all but special damages after retraction as denying a remedy by due course of law for injury to reputation.

In *Comer v. Age Herald Publishing Co.,* 151 Ala 613, 44 So 673, 13 LRA (NS) 525, the statute provided that in case of retraction, where there was no proven malice, only "actual damages" could be recovered. In order to save the constitutionality of the statute the court construed "actual damages" to include both general and special damages.

In *Ellis v. Brockton Publishing Co.,* 198 Mass 538, 84 NE 1018, the statute provided:

" 'Unless the plaintiff proves actual malice or the want of good faith, or a failure either to retract or offer to retract as aforesaid, he shall recover damages only for the actual injury sustained, but in no action of libel shall exemplary or punitive damages be allowed.' " R. L. c. 173, § 92, as quoted in 198 Mass at 543 (1908).

The court in order to avoid constitutional difficulties construed "actual" to include both general and special damages.

In *Meyerle v. Pioneer Pub. Co.,* 45 ND 568, 178 NW 792, the statute barred all but special damages, absent bad faith, unreasonableness, or failure to retract after notice. The court held that retraction in cases of good faith would avoid punitive damages and mitigate general damages, but would not avoid general damages for such injuries as remained after the retraction. This construction was again made to save the constitutionality of the statute.

In *Ross v. Gore,* 48 So2d 412 (Florida, 1950), the statute barred all but "actual damages" in cases of retraction where there had been no actual malice. The Florida court, again in order to save the constitutionality of the statute, construed "actual damages" to mean general damages.

This summary of the cases I have found shows that prior to *Werner v. Southern Cal. etc. Newspapers,* 35 Cal2d 121, supra, none of the many courts called upon to review retraction statutes had held constitutional a statute which made retraction the exclusive remedy for libel. In two states similar statutes do not appear to have been tested in the appellate courts. Baldwin's Kentucky Rev Stat, §§ 411.050 (1955), 411.061 (Cum Supp 1961); Neb Rev Stat 1943 (1959 Cum Supp), § 25-840.01.

In 1950, the California Supreme Court upheld the California statute. California has no constitutional section like our Article I, § 10. The majority opinion, by Traynor, J., is, in many ways, a persuasive argument for parliamentary absolutism. *Werner v. Southern Cal. etc. Newspapers,* 35 Cal2d 121, supra. It is not likely, therefore, that the California majority

would have reached a different result under our constitutional provision. The California majority, like ours, sees the question as one of policy that must be addressed to the legislature rather than to the court. The California majority held that a proper exercise of judicial restraint prevented the court from making a qualitative judgment upon the adequacy of the remedy, and that legislative elimination of a remedy at law invaded no constitutional right. In so holding, however, the California court gave considerable attention to policy arguments of its own. The California majority thought, for example, that the Assembly was moved to eliminate the "evil" of jury trials. *Werner v. Southern Cal. etc. Newspapers,* supra; and see Chafee, *Possible New Remedies for Errors in the Press,* 60 Harv L Rev 1. Such considerations are, of course, matters for legislative resolution within constitutional limits. But expressed constitutional limits should not be ignored. Strong dissenting voices vainly urged California to follow the weight of authority elsewhere. The dissenting justices there suggested that the majority was exercising judicial abdication rather than restraint.

This court has recently reaffirmed the rule that unless we can say that the Legislative Assembly acted contrary to an express constitutional limitation its action is valid. The question of legislative wisdom is not subject to judicial review. *State ex rel Overhulse v. Appling,* 226 Or 575, 361 P2d 86; *Warren v. Marion County et al.,* 222 Or 307, 327, 353 P2d 257, and cases cited therein. I would not depart from these decisions. However, where the constitution has guaranteed its authors and their successors a remedy, if the legislature thereafter eliminates the only remedy known to the law and substitutes something else, it is a judi-

cial function to resolve a properly presented question whether the substituted remedy is, in fact, a remedy.

The majority says the statute is as proper an exercise of legislative discretion as are the widely accepted automobile-guest statutes, city-sidewalk statutes, workmen's compensation laws, and the so-called heart-balm statutes referred to in the *Werner* case. The analogy between ORS 30.165 (the retraction statute) and legislation outlawing breach-of-promise-to-marry actions is weakened by the fact that the plaintiff in a libel case seeks to vindicate a constitutional right, and not merely a common-law right. Further, such a plaintiff does not ordinarily have the attributes of a volunteer frequently possessed by plaintiffs laboring under other statutes which substitute, or in certain cases eliminate, common-law remedies. With reference to the automobile-guest statute, this court observed that there was no established rule of common law covering such cases when Article I, § 10, became part of the basic charter. *Perozzi v. Ganiere,* supra, 149 Or at 347. In the so-called heart-balm statutes, no constitutional rights were involved. I recognize that, in each of the instances mentioned, a proper respect for the prerogatives of the legislative branch of government has compelled the courts to uphold a substitution of a substantial alternative remedy for a common-law cause of action, or the outright elimination of a remedy when to do so violated no constitutional guarantee. *Perozzi v. Ganiere,* 149 Or 330, supra (guest statute); *Noonan v. City of Portland,* 161 Or 213, supra (immunity of cities); *Evanhoff v. SIAC,* 78 Or 503, 154 P 106, *Atkinson v. Fairview Dairy Farms,* 190 Or 1, 222 P2d 732, and *Bigby v. Pelican Bay Lbr. Co.,* 173 Or 682, 147 P2d 199 (workmen's

compensation); *Magierowski v. Buckley*, 39 NJ Super 534, 121 A2d 749 (New Jersey heart-balm law).

But here the fatal defect is that the legislature has left the victim of an injured reputation no substantial remedy at all. Retraction, even if it reaches the same audience reached by the defamatory matter, does not compensate for the loss for which no proof can be produced, but which the law has traditionally protected by the jury verdict. Legislative objectives, however worthy, do not provide a constitutional basis for sacrificing the plaintiff's right to a hearing. It is no answer to say that juries can not be trusted, nor that rascals might profit from the jury system, nor that any significant number of persons who see one television program will probably see another with its remedial retraction, so there is no harm in denying one a day in court. Due process of law is not so easily ignored.

On the fundamental question here presented, I have found no case which satisfactorily answers the objection expressed in 1888 by the Michigan court when it was considering a statute far less drastic than our own. There the court, after addressing itself to the unreality of a remedy purporting to give only special damages to women whose chastity may have been impugned or to defamed members of ethical professions for the destruction of their practices, considered the shopkeeper. We quote:

"* * * The cases must be very rare in which a libel will destroy business profits in such a way that the loss can be directly traced to the mischief * * *. The statute does not reach cases where a libel has operated to cut off chances of office or employment in the future, or broken up or prevented relationships not capable of an exact money standard, or produced that intangible but fatal

influence which suspicion, helped by ill will, spreads beyond recall or reach by apology or retraction. Exploded lies are continually reproduced without the antidote, and no one can measure with any accurate standard the precise amount of evil done or probable." *Park v. Free Press Co.*, supra, 72 Mich at 565, 566.

Similar expressions are found in the cases I have cited, and in the comments of the reviewers. See Clarence Morris, *Inadvertent Newspaper Libel and Retraction,* 32 Ill L Rev 36, supra; William Frye, Note, 36 OLR 70. Professor Morris, in his primer on torts, observes that while the *Werner* decision in California may be a turning point in the law of libel, it is in the wrong direction. Morris, Torts (1953) 297. I am sorry to see Oregon turn the same way.

I would reverse the trial court.

WARNER and SLOAN, JJ., concur in this dissent.

SLOAN, J., dissenting.

I concur in the opinion of Justice GOODWIN. However, because of the importance of the decision, it seems proper to express some additional considerations that must influence a judgment of this consequence. If the judicial policy adopted is to be consistently followed, then this decision will be one of the most far reaching that this court has announced in recent years. The court has adopted the majority opinion in *Werner v. Southern California Associated Newspapers,* 1950, 35 Cal2d 121, 216 P2d 825, 13 ALR 2d 277. It thereby embraces the most extreme view of judicial deference, if not surrender, to legislative supremacy. It is not the intent of this opinion to attempt to say that only calamity will follow. It is, rather, an attempt to express a differing point of view that may,

it is hoped, be of value to those who will later continue to mold the judicial policy of this state.

It is the purpose of this opinion to draw into sharper focus the distinction between judicial review of legislative acts that are within the constitutional limits of legislative power and those acts wherein the legislature abridges the constitutional function of the judiciary. To avoid the tedium of frequent citations and references, I have collected in a footnote[1] much of the material particularly used in preparing this opinion. It is not exhaustive of the literature on the subject, by any means. It has been used because it is the best material found in respect to the historical development of judicial review in the state appellate courts. Although the writing on the work of the Supreme Court is without limit, too little attention has been given to judicial review by appellate courts at

---

[1] Doskow, Historic Opinions of the United States Supreme Court (1935).

Coxe, Judicial Power and Unconstitutional Legislation (1893).

Thayer, Thayer Legal Essays (1908).

Haines, The American Doctrine of Judicial Supremacy (1932).

Corwin, The Constitution and What It Means Today, 12th Ed. (1958).

Carey, The Oregon Constitutional and Proceedings and Debates of the Constitutional Convention of 1857 (1926).

Schwartz, The Supreme Court (1957).

Warren, Congress, The Constitution and the Supreme Court (1935).

Dodd, The Problem of State Constitutional Construction, 20 Col L Rev 635, 650, 651 (1920).

Recent Decisions, Constitutional Laws—Presumption of Validity Not Applicable to Statutes Dealing with Civil Liberties, 40 Col L Rev 513, 531, 533, (1940).

Case Note:

Avoidance of Constitutional Issues in Civil Rights Cases, 48 Col L Rev 427 (1948).

Shearer, The Political Utility of Judicial Review, 2 Kan L R 392 (1954).

33 Minn L Rev 390, 392, 393 (1949).

The Supreme Court and Responsible Government 40, No. 1, Nebr L Rev 16 (1960).

Dean, Judicial Review, Judicial Legislation and Judicial Oligarchy, 34 Or L Rev 20 (1954).

Thiele, Jr., Judicial-Self Restraint in New Jersey, 8 Rutgers U L Rev 501 (1954).

Jaffee, The Right to Judicial Review, Part 2, 1958, 71 Harv L R 769.

Field, Unconstitutional Legislation in Minnesota, 35 American Political Science Review 898 (1941).

Field, Unconstitutional Legislation in Indiana, 17 Ind L J 101, (1941).

Hickman, Judicial Review of Legislation in Utah, 4 Utah L Rev 52, (1954).

the state level. It has been and is necessary to consider the historic background of judicial review as such. However, the problem here is, basically and simply stated, shall the court recognize legislative supremacy even when the legislature is tampering with constitutionally stated rights? When the legislature sees fit to bar a citizen's access to the courts must that legislative determination be treated with the same deference that should and must be extended to an exclusively legislative purpose?

The problem of this particular case will be approached from two directions. One, from the aspect of the protection given by the due course of law provisions of the state and federal constitutions with particular reference to Section 10, Article 1, of our own constitution. And, two, a look at the broader aspects of legislative restraint of judicial function.

It is said that the statute provides a remedy equivalent to that of an action for libel. Even if this assumption were correct, which it is not, the argument is wide of the mark. The test is not to decide if a retraction is equivalent to damages. What must concern us is to decide if the remedy is one accorded by due course of law.

The guarantee of Section 10, Article 1, of the Oregon Constitution that "every man shall have remedy by due course of law for injury done him in his person, property or reputation" is somewhat unique in the inclusion of the word "reputation." It was not a happenstance use of the word by the framers. The proceedings of the Constitutional Convention, before cited, make it clear that the use of the word was deliberate. It is inferable, to say the least, that by this means the framers wrote into the constitution a cause of action for libel as they knew that cause

of action to then exist. Other provisions were considered at the convention which would have limited a cause of action for libel but these failed of adoption. The convention delegates included able lawyers. It cannot be assumed that they acted with lack of understanding. The proceedings demonstrate that the cause of action was not only deemed essential for the protection of individual citizens, but this, together with the provisions of Section 8, Article 1, were to provide required restrictions upon the otherwise absolute freedom of the press. The proceedings available to us may not be conclusive but they are not to be overlooked in deciding if the legislature can nullify that specific command of the constitution.

In the now familiar case of *Ohio Valley Water Co. v. Ben Avon Borough,* 1920, 253 US 287, 40 S Ct 527, 64 L Ed 908, it was held that in a rate case "if the owner claims confiscation of his property will result, the State must provide for submitting that issue to a judicial tribunal for determination upon its own independent judgment as to both law and facts; otherwise the order is void because in conflict with the due process clause, Fourteenth Amendment." 64 L Ed 914. Ever since that decision was read, together with the dissent of Justice Brandeis, the holding that the court must exercise "independent judgment" as to both law and facts has been an irritant that has created much agitation.

However, the compulsion for judicial due process upon an allegation of confiscation has never been denied or modified. Are we then to hold that confiscation of property holds some higher right than confiscation of reputation? Particularly, when by our own constitution reputation is to be protected equally with property. By what right does the legislature or

this court attempt to assess the value of property as entitled to a different degree of protection than injury to person or reputation? If the legislature were to permit the Highway Department to take property and rule that the taker would be the sole judge of the value thereof would this court sustain such a law? Certainly, it would not go so far. Yet by some unexplained alchemy the value of reputation is now degraded to second rate status in the constitutionally protected values. Justice Brandeis has recognized that the legislative function in the form of administrative action, is not judicial due process. In *Ng Fung Ho v. White,* 1922, 259 US 276, 284, 285, 42 S Ct 492, 495, 66 L Ed 938, he said:

> "It may result also in loss of both property and life; or of all that makes life worth living. Against the danger of such deprivation without the sanction afforded by judicial proceedings, the Fifth Amendment affords protection in its guarantee of due process of law. The difference in security of judicial over administrative action has been adverted to by this court."

Although in some instances due process may be done without benefit of the judicial robe, it has not been held that constitutionally protected rights can be taken other than by judicial process.

It is said, however, that the above comparison to legislative condemnation of property is inapposite because the only measure of damages for taking property is money. And, therefore, the amount of money must be decided by judicial due process. That is not the question. The question is: Who will decide how much money value is lost, if any, by the taking of property or by the taking of reputation? The majority hold that the legislature can predetermine that repu-

tation never has money value. If the legislature can, as a matter of "policy," decide that the taking of reputation can never have any money value then what other constitutional restriction can be found that precludes it from legislating a policy that land in this state, taken negligently or by force of law, shall never exceed the value of $100 per acre? Or $5 an acre? The only difference between such a statute and the one we consider is the historically instinctive notion that damage to or the taking of land has some precise measurable value and that damage to reputation or to the person does not. A review of the evidence in any condemnation or tax case should dispel that ingrained instinct which lingers with land.

In the matter of fact the entire premise of the majority decision in this case is based upon the assumption that loss of reputation; no matter how negligently or recklessly taken, can never result in monetary loss. It is assumed that loss of reputation can only be compensated for by informing those who choose to notice that the wrongdoer was mistaken. The assumption that reputation has no money value is contrary to every precept we are taught from childhood. If a more practical example is desired, ask any reformed ex-convict seeking employment. Ask any professional man whose sole worth in life is his reputation. Ask any advertiser who spends $10 a year or $10,000,000 establishing the reputation of his product or service.

The problem is not whether legislatively fixed compensation for loss of land or retraction for loss of reputation is the equivalent of judicially determined rights. The question is: Does it meet the requirements of the constitution?

It is said that the cases sustaining the guest stat-

utes and workmen's compensation acts in the several states support the power of the legislatures to pass the act in question. At least in Oregon, the cases do not support that conclusion. The first guest act which attempted to abolish the cause of action altogether was held unconstitutional. *Stewart v. Houk,* 1928, 127 Or 589, 271 P 998, 272 P 893, 61 ALR 1236. The Workmen's Compensation Act of this state does not attempt to deny judicial process.

A legislative declaration of policy is not an adequate substitute for due process.

The second approach is directed at the conflict which has, and does, exist between the exercise of judicial versus legislative function. Reference to some of the works cited at the outset will disclose that, historically and now, this has been a conflict of many participants, of unending duration and has occurred on both the federal and state fields of contest. It is interesting, if not significant, to note that this debate started with decisions of some of the state courts before the federal constitution was adopted.[2] *Marbury v. Madison,* 1803, 1 Cranch 137, 2 L Ed 60, was not the original sin that fomented charges of the "usurpation" of power. The debate as to the extent of judicial review began before then and has never stopped at either the state or federal level.

The Federal Supreme Court has been attacked by state righters when that court was dominated by federalists. It has been under equally strong attack by the federalists when it has been dominated by the state righters. The most recent all out attack, in 1937, is still within the memory of most of us. In an earlier

[2] Haines, The American Doctrine of Judicial Review, supra, Note 1, p 148 et seq.
Coxe, Judicial Power and Unconstitutional Legislation, supra, Note 1.

time some of the state courts withstood similar attacks. In more recent times the attacks upon state courts have subsided or ceased. But that is not because the state courts have relinquished any of their power to the legislative process. In fact the whole struggle that at many times has engaged the active, if not violent, attention of the whole people and has been fought by men and groups of the strongest political power can, thus far, lead to but one inescapable conclusion: The people, from colonial days to now, have never approved nor tolerated any restriction of the fundamental exercise of judicial power. Every attempt to circumscribe or limit the power, no matter by what force it has been agitated, has been consumed by the strength of public opinion. All attempts, save one, to amend the federal constitution so as to restrict the Supreme Court has failed. The Eleventh Amendment restrained actions against a state. Every other amendment that touched judicial power, enlarged it.

Every existing state constitution was adopted after questions of the extent of judicial power had several times erupted. The men who framed and the people who adopted the state constitutions were much aware that, unless restrained by edict of the constitutions they were adopting, the courts would continue to exercise that power. Nevertheless, not one state constitution has deprived its courts of the power of judicial review. Various forms of restraint have been suggested, and vigorously supported by strong political forces; few have been adopted by any state. To the contrary every state constitution has imposed many restrictions on the power of the legislature.

What has just been said may be considered academic to the question at hand. Not so, if it is given the concept intended.

Judicial power is not a handmaiden zealously locked in the unapproachable archives of the courthouse. It is not a power beneficial to the judge or that permits him any unbridled authority over the lives and well being of the people. It is the power the people have permitted to remain in the judges to protect them from executive or legislative encroachment. It is the power, I believe, the people wanted exercised in just such a case as this. The instant statute, the impact of which was unknown to those who would someday be deprived of rights, is the very kind of legislation for which the power of judicial review was retained.

What people could possibly have been present to resist the forces that induced the legislature to enact the statute in question? What libeled person-to-be could anticipate that as a result of this legislative action his access to a court would be barred to him? Few, if any, of the citizens of this state would have been aware that a tampering with constitutional rights was in progress. Nor is it any answer, as it is said in *Werner v. Southern California Associated Newspapers*, supra, 35 Cal2d 121, 216 P2d 825, that the restrictions on the legislature is found only in the concerted action of an alert citizenry. The practical reality of the legislative function cannot be dismissed with a platitude. What conceivable group of citizens could possibly counter the pressure of the group that induced the legislature to pass this act. No, the people have placed reliance on the courts to preserve this particular kind of right. For, despite the platitudes, no other protection exists. To me, it is a greater wrong to shun judicial power in this kind of case than to exercise it to the full extent. Our duty to the people is paramount and absolute. It is not to be curtailed by a

mistaken sense of judicial obeisance to the legislative mandate.

It has been said:

> "In many countries the framers of law are regarded as possessing unrestricted power, as holding in their hands the life and liberty of every citizen, who owes obedience to their most monstrous and arbitrary edict, until, by sounder judgment, the edict is repealed. A minority can only trust to the forbearance of those who hold law making power. When that fails it can only resist by force. Such was the view of those who framed the constitution of the first French republic. They inserted a declaration of the rights of man more elaborate than any bill of rights we have. They attempted to secure its observance by directing that it be 'written upon tablets and placed in the midst of the legislative body and in public places,' that 'the people may always have before its eyes the fundamental pillars of its liberty and strength, the authorities the standard of their duties and the legislator the object of his problem.'" Green, 47 Amer. L Rev 92, 1913.

But, says Green, in their hour of need the meaningless phrases failed the people of France. Green says that those who framed our constitutions were of a different mind than the "statesmen of France." History reveals that those who proposed and urged the adoption of the Bill of Rights to the Federal Constitution anticipated that it would be the courts, not the legislature, that would enforce them. See *Mapp v. Ohio,* 367 US 643, 6 L Ed2d 1081, decided June 19, 1961.

When our constitution was adopted the people of this state knew that it had been judicial power that had breathed life and force into what would otherwise have been constitutional generalities. It must be

for this reason that people, then and since then, have not just tolerated but supported the use of judicial power as it has developed in this nation and state. Witness the amendment to Section 6, Article IV, of the Oregon Constitution adopted in 1952. This amendment placed in this court the power to compel legislative reapportionment. The people then knew that the legislature would continue to ignore the constitutional mandate which had required the legislature to periodically do so.

Nor have either the federal or state courts been reticent in restricting legislative encroachment upon judicial soil. In an early case of *Den ex dem Murray v. Hoboken Land and Improvement Company*, 1855, 59 US (18 How) 272, 284, 15 L Ed 372, the court said:

> "To avoid misconstruction upon so grave a subject, we think it proper to state that we do not consider Congress can either withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty; nor, on the other hand, can it bring under the judicial power, a matter which, from its nature, is not a subject for judicial determination."

That case has never been overruled. In *Crowell v. Benson*, 1931, 285 US 22, 56, 57, 52 S Ct 285, 291, 76 L Ed 598, the above was quoted with approval and followed with even stronger language from the pen of Chief Justice Hughes. True, the latter case carries a dissent by Justice Brandeis in which he contended that the judicial power was vested in the general government and not in the inferior federal courts. The dissent emphasizes that a majority of the court thought otherwise. That opinion has not been changed by any decided case. Our own court has said

the same thing. *West v. Jaloff,* 1925, 113 Or 184, 262 P 642, 36 ALR 1391; *Stewart v. Houk,* supra, 127 Or 589, 271 P 998, 272 P 893. In fact the majority opinion should now openly overrule these and similar cases. It does so by implication.

The court of Arkansas, Indiana and Utah have voided statutes which limited the right of appeal. *St. Louis & N. A. Rd. Co. v. Mathis,* 1905, 76 Ark 184, 91 SW 763; *Ex Parte France,* 1911, 176 Ind 72; *Patterick v. Carbon Water Conservancy District, et al,* 1944, 106 Utah 55, 145 P2d 503. In fact the statistical studies made of the constitutional decisions of the courts of Indiana, Utah and Minnesota, as well as in a study of a group of ten other states,[9] show that high in the subject matter of legislative enactment voided by the highest appellate courts of those states were those affecting the courts.

The deference we should pay to legislative action within the legislative function is not that which should be given to legislation when it limits or denies access to a court for the redress of wrong committed. All too often such attempted restrictions have been

[9] Field, Unconstitutional Legislation in Minnesota, supra 35 American Political Science Review 898.

Field, Unconstitutional Legislation in Indiana, supra, 17 Ind L J 101.

Hickman, Judicial Review of Legislation in Utah, supra, 4 Utah L Rev 52.

Field, Judicial Review of Legislation in Ten Selected States, 1943.

The last cited compilation is not available to us. Our reference to this compilation is found in Hickman's compilation of Utah decisions. He names only nine of the states, Colorado, Illinois, Indiana, Massachusetts, New Hampshire, New York, North Dakota, South Dakota and Wisconsin. Hickman makes this comparison:

"More important that the number of statutes before the court is the subject matter of the statutes attacked. If all of the statutes attacked since 1896 be considered, the figures for Utah follow closely the data which Professor Field collected for ten related states."

He then presents a table showing that in the ten related states and in Utah, the subject of government was involved in 28 percent of the statutes. Next in numerical order in the ten states was the subject of Courts. For the ten states, the subject was involved in 18 percent of the statutes and in Utah 13 percent, which Utah was fourth in numerical order.

for the benefit of the few at the loss of the many. This statute is typical. The courts have, in recent years, with common acquiescence refused to interfere in legislatively decided economic, political and social policies. But the legislature is, and should be, equally bound to refrain from unwisely interfering with a citizen's right to enter the door of a courtroom for supplication and relief. In such an instance the presumption of legislative validity should fail and the burden should be placed on the interests protected by the legislative action to show, by evidence of strong need, the evils which justified the abolition of an established cause of action. This is particularly true when the cause is one recognized in the constitution.

Nor does it follow that if we void this statute it will freeze every cause of action as it existed when the constitution was adopted. The point is that due process, as it exists in the form of an established cause of action should not be abolished unless there is strong evidence that the cause of action has become so corrupted that it results in greater injustice than it does justice. A cause of action, as in this case, should not be abolished to remedy evils that do not exist and cannot be shown to exist.

In the case of *Schneider v. State of New Jersey,* 1939, 308 US 147, 151, 60 S Ct 146, 84 L Ed 155, the court said:

> "In every case, therefore, where legislative abridgment of the rights is asserted, the courts should be astute to examine the effect of the challenged legislation. Mere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights

so vital to the maintenance of democratic institutions. And so, as cases arise, the delicate and difficult task falls upon the courts to weigh the circumstances and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of the rights."

For it must be remembered that when the legislature abolishes a cause of action to benefit a favored few it must be taken to be because the courts have failed to protect the rights of the few. It is a recognition that the courts have allowed fraud or partiality to warp the course of justice. When the courts sustain the act it is a tacit acknowledgment not only of the failure to dispense justice but also an admission that the courts cannot remedy the wrong, if one exists. If the courts sustain legislative negation of established judicial process by applying only the test of a conceivable rational reason for the legislation, then the way is open for the legislature to nullify any form of judicial due process. If judicial due process is worthy of its keep it should not be so readily surrendered.

Professor Thayer in the first of his Legal Essays (1908) divides constitutional decisions into three general classifications: (P. 33 et seq.)

"(1) where judges pass upon the validity of the acts of a co-ordinate department;
"(2) where they act as advisers of the other departments;
"(3) where, as representing a government of paramount authority, they deal with acts of a department which is not co-ordinate."

In respect of the third classification he later says:

"When the question relates to what is admitted not to belong to the national power, then whoever construes a State constitution, whether the State

or national judiciary, must allow to that legislature the full range of rational construction. But when the question is whether State action be or be not conformable to the paramount constitution, the supreme law of the land, we have a different matter in hand. Fundamentally, it involves the allotment of power between the two governments, —where the line is to be drawn. True, the judiciary is still debating whether a legislature has transgressed its limit; but the departments are not co-ordinate, and the limit is at a different point. The judiciary now speaks as representing a paramount constitution and government, whose duty it is, in all its departments, to allow to that constitution nothing less than its just and true interpretation; and having fixed this, to guard it against any inroads from without."

Thayer, who was one who would have severely limited judicial review, later contended that the above rule should not apply when state courts were testing state legislation against the federal constitution. His argument was that since an appeal to the Supreme Court could only be taken when the state court sustains the legislation the state court should sustain on any basis at all. Whether this proposed restraint on the state courts was sound is arguable. The major premise was sound. And if that be true then we should test the instant statute against the superior guarantees of rights contained in the federal constitution. As we have before seen, the Supreme Court has been and now is unwilling to surrender constitutionally protected rights of any citizen in favor of legislative encroachment based only on some rationally conceivable legislative declaration of policy.

In the case of *Boyd v. United States*, 1885, 116 US 616, 6 S Ct 524, 535, 29 L Ed 746, the court said:
"It may be that it is the obnoxious thing in its

mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely: by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property shall be liberally construed. A close and literal construction deprives them of half their efficacy and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be obsta principiis. We have no doubt that the legislative body is actuated by the same motives; but the vast accumulation of public business brought before it sometimes prevents it, on a first presentation, from noticing objections which become developed by time and the practical application of the objectionable law."

This expression was quoted, in part, and approved in *Mapp v. Ohio*, 367 US 643, 81 S Ct 1684, supra.

In conclusion may it be said, with the proper deference to those who hold an opposing view, that it has been the strong judges and the strong courts that have transformed constitutional promises into living rights. Rights that can be lost by innocuous nibbling as well as by bold assertion. The concepts that have been preserved until now were not attained nor maintained by judicial surrender.

Benjamin Cardozo from his pallet of language blended the words to color the thoughts I have ineptly endeavored to express:

"* * * That is the argument of the critics of the existing system. My own belief is that it lays too little stress on the value of the 'imponderables.' The utility of an external power restraining the

legislative judgment is not to be measured by counting the occasions of its exercise. The great ideals of liberty and equality are preserved against the assaults of opportunism, the expediency of the passing hour, the erosion of small encroachments, the scorn and derision of those who have no patience with general principles, by enshrining them in constitutions, and consecrating to the task of their protection a body of defenders. By conscious or subconscious influence, the presence of this restraining power, aloof in the background, but none the less always in reserve, tends to stabilize and rationalize the legislative judgment, to infuse it with the glow of principle, to hold the standard aloft and visible for those who must run the race and keep the faith." Cardozo, The Nature of the Judicial Process, 1922. (Footnotes omitted).

The judgment should be reversed. I am authorized to say that GOODWIN, J., joins in this dissent.